[No. D038316. Fourth Dist., Div. One. Jan. 30, 2003.]

CITY OF SAN DIEGO, Plaintiff and Appellant, v.
RANCHO PENASQUITOS PARTNERSHIP et al., Defendants and
Respondents.

1014

1016

COUNSEL

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, Claudia Gacitua Silva, Deputy City Attorney; Meyers, Nave, Riback, Silver & Wilson, David W. Skinner and Stefanie Y. Gandolfi for Plaintiff and Appellant.

Rutan & Tucker, Jeffrey M. Oderman and Douglas J. Dennington for Defendants and Respondents.

OPINION

NARES, J.—In this eminent domain action the plaintiff City of San Diego (the City) condemned 10.94 acres of real property, part of a 108.75-acre parcel of property zoned for agricultural use that was owned by the defendants Rancho Penasquitos Partnership, Ting Fang Lin, Yu Chun Huang, Cindy C. Kasai and Pai Ho Wey (collectively RPP). The City took RPP's property for the State Route 56 freeway (SR-56) project. The City asserted at jury trial that because it had a zoning restriction in place prohibiting higher density development of properties such as RPP's that were in the potential path of SR-56 until the SR-56 project was approved, a zoning change was

not possible absent the SR-56 project, and therefore the property must be valued at its current zoning for agricultural use. The City contended the fair market value of the condemned property was $120,000 per acre, or $1,285,200 in total value, with no severance damages to RPP's property that was not condemned because of offsetting benefits provided by the SR-56 project.

RPP argued that because the City was both the condemning agency and the entity responsible for the prohibition on development, and the restriction was designed to minimize the City's cost of acquiring the property through eminent domain, the condemned property's value must be based upon an appraisal that did not consider the City's prohibition on zoning changes for properties in the potential path of SR-56. Furthermore, RPP argued that it was reasonably probable that the property could be rezoned to residential use and that it had a value of $350,000 per acre, for a total value of $3.83 million, with severance damage to RPP's property that was not condemned of $4.62 million.

The City also sought to exclude testimony from RPP's experts concerning rezonings and sales of neighboring properties that occurred after SR-56 was approved, on the basis that they were "project-enhanced" and in the absence of SR-56 it was too speculative to assume that the rezonings and sales would have occurred. RPP in turn argued that these rezonings and sales would have occurred even without SR-56, and therefore their property also stood a reasonable probability of rezoning to residential use.

The court agreed with RPP on both evidentiary disputes. First, the court granted RPP's motion in limine, excluding from evidence the City's zoning regulations that prohibited a rezoning of RPP's property from agricultural use absent approval of the SR-56 project. The court held that because in eminent domain actions condemned property must be valued at its "before" condition; that is, excluding the fact and impact of the SR-56 project, the City could not base its valuation upon land use regulations that prohibited development pending the SR-56 project, whose very purpose was to minimize the City's acquisition costs. The court also allowed RPP's experts to testify concerning the rezonings and sales of neighboring properties, finding that it was a matter of proof and argument to the jury as to whether they were "project-enhanced" or would have occurred even without SR-56.

The jury found that the fair market value of the condemned property was $2,870,280, and that the damage caused to the property from which its was severed was $1,035,930, for a total award of $3,906,210. The court entered judgment in accordance with the jury's verdict.

The City appeals, asserting that the court committed prejudicial error by (1) excluding the City's zoning restrictions prohibiting a zoning change absent approval of the SR-56 project; (2) allowing RPP to introduce evidence of "project-enhanced" rezonings for other properties in the area in support of RPP's valuation theory; (3) failing to allow evidence of the zoning restriction to rebut RPP's experts' testimony; (4) allowing "perjurious" testimony by RPP's expert and (5) failing to prepare a statement of decision as to its evidentiary rulings.

We conclude that the court correctly excluded from evidence the City's zoning restriction precluding upzoning of RPP's property absent approval of the SR-56 project because (1) the zoning and condemning agencies are the same and (2) the restriction discriminates against RPP's property in order to depress its value for a future taking by eminent domain. We also conclude that the court did not err in allowing RPP's experts to testify concerning rezonings of other properties as it was a question of fact for the jury to determine whether the upzonings were "project-enhanced" or not. We further conclude that the court did not err in refusing to allow evidence of the City's zoning restriction to "rebut" RPP's expert's testimony. We hold that the court did not allow "perjurious" testimony by RPP's expert. Finally, we conclude that the court was not required to prepare a statement of decision in this matter as the court's evidentiary rulings were not akin to a "trial" of factual issues. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Condemned Property*

RPP owned approximately 108.75 acres of unimproved land in the City within subarea IV (known as Torrey Highlands) of the North City Future Urbanizing Area (NCFUA). The NCFUA is approximately 12,000 acres created " 'to avoid premature urbanization, to conserve open space and natural environmental features and to protect the resources of the City by precluding costly sprawl and/or leapfrog urban development.' " Zoning within the NCFUA was designated as A-1-10 agricultural, allowing one dwelling per every 10 acres, or, under a clustering option, one residence per every four acres.

However, responding to a severe shortage of available land and the lack of an overall plan for the orderly development of the NCFUA, in October 1992 the City adopted a framework plan for the NCFUA, which was incorporated into the City's general plan. The framework plan was designed to provide a blueprint for the future urbanization of the NCFUA.

B. *The SR-56 Project*

The then proposed SR-56 was established by the California Legislature in 1959. SR-56 was needed to provide a regional east-west link between Interstate 5 and Interstate 15. SR-56 was a part of the circulation element of the City's planning documents since 1965.

As part of the planning for the future development of the NCFUA, the City restricted development of subareas III and IV (wherein RPP's property lay) because the proposed SR-56 was to cross those areas. To this end, the framework plan provided:

"2.6a Because of the importance of other planning efforts to the future of several NCFUA subareas, the following principles will govern timing of completion of subarea plans for individual subareas: [¶] . . . [¶]

"•Subareas III and IV: The City will undertake an alignment study for SR-56. Subarea Plans for these areas may be approved, provided sufficient corridors are designated for alternative alignments for SR-56. *However, discretionary approval for development in these subareas shall not be approved prior to the adoption of the City's final alignment for SR-56.*" (Italics added.)

C. *Approval of Subarea Plan for Torrey Highlands*

In 1996, the City adopted a subarea plan for the Torrey Highlands portion of the NCFUA, which was approved by voters in November 1996. The voters authorized a shift in residential land uses in Torrey Highlands from the A-1-10 designation to densities as high as 10 dwelling units per acre. The subarea plan also provided that development could not occur until the exact route of SR-56 was selected:

"8.2.3 State Route 56 Alignment

"Final selection of the alignment for SR-56 must occur *prior to discretionary approval of any development in the Torrey Highlands community which is affected by the final alignment.*" (Italics added.)

The City also adopted a transportation phasing plan for Torrey Highlands which conditioned the right of property owners to obtain building permits for higher density development on the SR-56 project being "assured to the satisfaction of the City Engineer."

According to the City, the purpose of the zoning restriction was to prevent development of land that might conflict with the final alignment of SR-56.

However, the ban on development did not apply to properties not within the proposed path of SR-56 and such properties could be upzoned upon application.

### D. *Final Alignment for SR-56*

In June 1998, the City certified the final environmental impact report (EIR) for the middle segment of SR-56 and approved the final alignment of SR-56's path. In November 1998, the Department of Transportation (Caltrans) did the same.

In June 1999, the City Engineer determined that the middle section of SR-56 was "assured" or fully funded. In July 1999, the City entered into a cooperative agreement with the State of California obligating it to acquire the rights-of-way for the middle segment of SR-56. The final alignment of SR-56 required the City to condemn 10.94 acres of RPP's property.

### E. *The Instant Action*

In September 1999, the City filed a complaint in eminent domain to condemn RPP's property. As we will discuss in more detail, the main issue in dispute was what evidence could properly be considered in valuing RPP's property. In particular, the parties disputed whether the City could rely upon its zoning restriction prohibiting upzoning of RPP's land absent approval of the SR-56 project and whether RPP could rely upon certain other properties' upzonings in assessing the value of RPP's property.

#### 1. *City's valuation theory*

The City's appraiser, Stephen Roach, rendered an opinion in his deposition that RPP's property did not enjoy a reasonable probability of a zoning change as of the date of value (September 22, 1999, the date the City deposited the amount it claimed was probable compensation and filed its complaint) because of the City's land use regulation that prohibited such rezonings until SR-56 was approved. According to Roach the property's value therefore had to be based upon the A-1-10 agricultural zoning applicable to that property at that time. Roach concluded that the fair market value of the condemned property was $120,000 per acre, for a total of $1,285,000.

The City designated William Dumka to testify as to whether there was a reasonable probability that RPP's property would receive a zoning change as of the date of valuation. Dumka stated in his deposition that it was his opinion that there was no reasonable probability of a zoning change in the

absence of the SR-56 freeway. In reaching this conclusion, Dumka relied heavily upon the City's zoning restrictions (discussed, *ante*) that prohibited upzoning or development until approval of SR-56. He was unsure what his opinion would be if he was required to exclude those restrictions from consideration of the issue.

However, at trial, Dumka testified that it was at least possible that RPP's property might be rezoned even without considering the SR-56 based zoning restrictions. Dumka also admitted that in rendering his opinion he failed to consider a number of facts, including (1) the City's development agreement with a landowner in subarea III of the NCFUA allowing up to 1,900 dwelling units without any requirement that SR-56 be "assured" or constructed; (2) the City's plan for subarea I of the NCFUA that authorized up to 2,628 dwelling units without the SR-56 freeway; and (3) the great demand for housing in the area.

Dumka admitted that the City could have authorized development of RPP's property at higher densities than allowed under the subarea plan even in the absence of SR-56. Dumka stated that property owners often can obtain development approval that contradicts the City's development restrictions if they can make the right "deal" with the City. Dumka testified that the City might allow such development if they could extract something they wanted from the landowner, such as traffic facilities.

### 2. *RPP's valuation theory*

RPP's valuation expert, John Mawhinney, opined that RPP's property did enjoy a reasonable probability of a zoning change to zoning consistent with the higher densities permitted under the Torrey Highlands Subarea Plan. Mawhinney concluded that the condemned property had a fair market value of $350,000 per acre, for a total value of $3.83 million. Mawhinney also was of the opinion that the portion of RPP's property that was not condemned was damaged by the condemnation and construction and use of SR-56 in the amount of $4.62 million, and that SR-56 would not benefit RPP's property that was not condemned in any manner. Mawhinney did not consider the City's zoning restriction that prevented rezoning of RPP's property because it was predicated upon and expressly tied to the SR-56 project.

Nicholas DeLorenzo was RPP's planning expert. DeLorenzo had been previously appointed by the City to assist in preparing the NCFUA framework plan. DeLorenzo was also retained by property owners in Torrey Highlands to develop the Torrey Highlands Subarea Plan and was largely responsible for drafting that plan.

DeLorenzo opined that even in the absence of the SR-56 project, RPP's property enjoyed a reasonable probability of a zone change. He stated that development in Torrey Highlands would have proceeded in generally the same manner allowed under the framework plan and subarea plan in the absence of the SR-56. DeLorenzo provided several reasons for this rationale. First, DeLorenzo opined that the A-1-10 zoning was never intended to be permanent. The City's general plan and the NCFUA framework plan described the area as a "future urbanizing area" and contemplated higher density use in the future because the current zoning was not effective in preventing undesirable development patterns.

DeLorenzo also relied on the fact that the higher densities authorized under the framework plan were caused by a housing shortage and need for development of appropriately accommodated public facilities. The need to move traffic between Interstate 5 and Interstate 15 was unrelated to these issues. DeLorenzo also relied on the fact that when the committee responsible for planning development of the NCFUA was adopting the framework plan, some members were opposed to SR-56 entirely and others wanted a smaller transportation corridor.

DeLorenzo relied upon the fact that when voters in 1996 approved higher density development in Torrey Highlands, such development was not conditioned upon construction of SR-56. According to DeLorenzo, once the voters had approved the higher density development for Torrey Highlands, the City would have a legal obligation to approve such higher density zoning.

DeLorenzo also cited to an undeveloped parcel adjacent to RPP's property that was located in the Rancho Penasquitos Community Plan, not the NCFUA, and therefore not subject to the zoning restrictions tied to the SR-56 project. DeLorenzo stated that even the City admitted that this property enjoyed a reasonable probability of a zoning change, and therefore the only basis for the City's position that RPP's property did not were the rezoning prohibitions in the framework plan and Torrey Highlands Subarea Plan. DeLorenzo opined that there was no legitimate reason to discriminate between RPP's property and adjacent property.

DeLorenzo also pointed out that SR-56 was not necessary for freeway access as RPP's property already had three existing points of street access and utilities needed for development. DeLorenzo opined that because of the severe shortage of available land and the demand for housing in the area the NCFUA would still be built without the SR-56 project, albeit with a revised transportation system.

DeLorenzo pointed out that both before and after the date of value (September 22, 1999), the City approved a number of upzonings in Torrey Highlands. Further, notwithstanding the City's requirement that SR-56 be assured before higher density development would be permitted in the NCFUA, the City authorized three other large development projects before SR-56 was "assured." These were a 1,900-unit development, a 100- to 120-unit development and a 2,628-unit development. DeLorenzo concluded that a 300-unit development on RPP's property would not require construction of SR-56 any more than these developments constructed without regard to SR-56.

### 3. *Motions in limine*

Prior to trial, the City brought a motion in limine to preclude RPP's experts from testifying, asserting that RPP's experts improperly excluded from their consideration the zoning restrictions that prohibited development in the absence of the SR-56 project. The City also brought a motion seeking to exclude any of RPP's evidence of comparable sales and rezonings to be submitted in support of its experts' opinions. RPP in turn brought a motion seeking to exclude the City's experts from rendering an opinion on the reasonable possibility of a zoning change because their opinions were based on the zoning restrictions that were predicated on the freeway project.

The court found that the City's zoning restrictions that banned upzoning and development of properties the City would later be acquiring for the SR-56 project could not be considered by the jury for the purpose of assessing whether it was reasonably probable that RPP would receive a zoning change absent the SR-56. The trial court found that the purpose of these restrictions was to prevent development of property the City would need to acquire for the SR-56 freeway. Thus, the court found that under California law the City could not introduce into evidence such restrictions nor could their experts base their valuation testimony upon such restrictions. The court, in making this ruling found that California law provided that "the agency which is condemning cannot . . . purport to exercise a police power by enacting a zoning ordinance which in reality discriminates against a group of parcels of land, in order to freeze their value with a view to future takings in eminent domain." However, the court allowed the City's experts to testify on valuation if they could render opinions with sufficient foundation while ignoring the zoning restrictions tied to SR-56's construction.

The court denied the City's motions seeking to exclude RPP's experts' testimony and evidence of comparable sales and rezonings on other properties. The court found that although most of the comparable sales and

evidence of rezonings were after the date the final EIR was approved for SR-56, that it was "a matter of argument . . . whether any increase in value is project enhancement . . . ."

4. *Trial proceedings relevant to the court's pretrial evidentiary rulings*

During trial RPP questioned its expert DeLorenzo whether there were any restrictions tying development of RPP's condemned property to SR-56 and whether there would be any legitimate planning basis for denying a rezoning application. DeLorenzo responded that there was not. The City objected to these questions, characterizing it as perjury. The court denied the City's objection: "I don't call it perjury. If the pretense is, which the state law requires, that this property be valued in its before-condition and without reference to the project, and if public policy is as I construed . . . . [¶] . . . [¶] . . . then . . . hypothetically you have to evaluate this property as if there were no restrictions because the restrictions that were imposed by the condemning authority have to be essentially nullified for the purposes of this hearing. So I have not construed that as inappropriate."

RPP's attorney sought to impeach the City's experts by asking whether they had relied upon inadmissible evidence (the City's zoning restrictions) in rendering their opinions given at their depositions. The City objected. The court denied the City's objection and then instructed the jury concerning its earlier ruling excluding evidence of the City's zoning restrictions related to SR-56: "I want to explain to you that before trial, counsel and I had some proceedings, and among the things that happened with that I ruled that one section of the framework plan, one section of the subarea plan and one section of the appendix to the public facilities finance plan were not to be referred to in terms of their substance and could not be relied upon by the experts in this case for their opinions. . . . [¶] So there may be some reference to a section of the framework plan or a section of the public facilities financing plan or a section of the public facilities financing plan that cannot be relied upon or had been relied upon in the past, and now what the opinion would be without reliance on that. [¶] As a juror, you must not speculate as to what those provisions were or as to the reasons for their exclusion."

In closing argument, counsel for RPP focused on the fact that the City's experts had relied upon inadmissible matters in rendering their opinions in their deposition testimony. Counsel also argued to the jury that "[y]ou can choose to base your verdict on opinions that were premised from the start on

valid legal principles, or you can choose to go with experts who weren't able to formulate their opinions based on the correct legal standards and just re-packaged their opinions here in this courtroom." Counsel argued that "[t]he City's whole case is built on the notion that without the freeway you wouldn't be able to build anything on the property except for . . . tomato farms or ten-acre lots." Counsel also accused the City of "hypocrisy" because other developments had been approved "before any requirement that State Route 56 either be financed, assured to be completed or completed." Counsel for RPP also argued that their expert had provided "the only appraisal that's non-discriminative, that doesn't treat [RPP's] property differently from the other properties that the City has allowed, approved for development without [SR-]56 being required."

### 5. *Relevant jury instructions*

The court instructed the jury on the effects of zoning ordinances in determining the value of RPP's condemned property: "An existing zoning ordinance bears on the availability of land for a particular use. The total effect of the local zoning laws must be considered in arriving at the appropriate measure of compensation in an eminent domain action. You should consider all of the factors which relate to this property in arriving at your decision concerning its highest-and-best use."

The court also instructed the jury that, with a limited exception, it could not consider any change in value to the property caused by the SR-56 project: "In determining the fair market value of the property, you may not include any change by the proposed SR-56 project that is the use which the plaintiff is to make of the property. However, the exception to this rule is as follows: You must include any increase in the market value of said property caused by the proposed State Route 56 project that occurred before June 16, 1998."

The court instructed the jury it was not to consider any effects on value caused by the EIR for SR-56 or its final alignment: "You may not include any change in value because of any preliminary action of the plaintiff relating to the taking of the property, such as the June 1998 certified environmental impact report for SR-56, or the selection of the final alignment for SR-56."

Because the court felt that the instructions on valuation were difficult to follow, it summed them up as follows: "So I want to kind of sum up, I am not going to comment on the evidence, but I want to just briefly comment on the instructions. [¶] . . . [¶] *To determine the fair market value of the*

*property being taken, you have to, essentially, pretend that State Route 56 does not exist."* (Italics added.)

### 6. Jury verdict and judgment

After two days of deliberations, the jury awarded RPP $2,870,280 as the fair market value of the condemned property. The jury also awarded RPP $1,035,930 in severance damages for the property not condemned by the City. The court entered judgment on the jury's verdict and the City timely appealed.

## DISCUSSION

### I. Standard of Review

As the City is challenging the court's decision to exclude evidence it sought to admit in support of its experts' valuation testimony and also the court's allowance of RPP's experts' valuation testimony, we review the court's rulings under the abuse of discretion standard. (See *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 503 [93 Cal.Rptr. 833, 483 P.2d 1] [court's decision to admit project-influenced comparable sales in eminent domain proceeding reviewed under abuse of discretion standard]; *County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1282 [22 Cal.Rptr.2d 117] [court's decision to exclude appraiser's valuation opinion where based upon improper considerations not an abuse of discretion].) Under this standard, we will not reverse a trial court's ruling if it was "based on a 'reasoned judgment' and complies 'with . . . '. . . legal principles and policies appropriate to the particular matter at issue.' [Citations.]" (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].) Rather, we will only overturn the court's decision if it " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].)

### II. Applicable Principles of Eminent Domain Law

" 'The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.' [Citations.] . . . [¶] ' "The word 'just' in the Fifth Amendment evokes ideas of 'fairness'

and 'equity' . . . ." ' [Citations.]" (*Ventura County Flood Control Dist. v. Campbell* (1999) 71 Cal.App.4th 211, 218-219 [83 Cal.Rptr.2d 725].)

Code of Civil Procedure[1] section 1263.310 provides that "[t]he measure of this compensation is the fair market value of the property taken." "Fair market value" is defined as follows: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing and able to buy but under no particular necessity for doing so, each dealing with the other *with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.*" (§ 1263.320, subd. (a), italics added.)

In order to determine the fair market value of a property being condemned in an eminent domain proceeding, "there must be a determination of the highest and best use to which the property being condemned can be put." (*San Diego Gas & Electric Co. v. Daley* (1988) 205 Cal.App.3d 1334, 1344 [253 Cal.Rptr. 144], disapproved on other grounds in *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720 [66 Cal.Rptr.2d 630, 941 P.2d 809].) Moreover, "[a] determination of the property's highest and best use is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner 'is entitled to show a reasonable probability of a zoning [or other change] in the near future and thus to establish such use as the highest and best use of the property. [Citations.]' [Citations.] The property owner has the burden of showing a reasonable probability of a change in the restrictions on the property." (*County of San Diego v. Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1058 [20 Cal.Rptr.2d 675].)

■ Further, in determining fair market value, including its highest and best use and the reasonable probability of a zoning change, any increase or decrease in the property's value caused by the project itself may not be considered: "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] (a) *The project for which the property is taken.* [¶] (b) The eminent domain proceeding in which the property is taken. [¶] (c) *Any preliminary actions of the plaintiff relating to the taking of the property.*" (§ 1263.330, italics added.)

"Simply stated, the rule is that any testimony of reasonable probability of zone change may not take into account the proposed [project] or any

___

[1]All further statutory references are to the Code of Civil Procedure unless otherwise specified.

influence arising therefrom. [Citations.] The probability of rezoning or even an actual change in zoning which results from the fact that the project which is the basis for the taking was impending cannot be taken into account in valuing the property in a condemnation proceeding. [Citations.] . . . Therefore, changes in land use, to the extent that they were influenced by the proposed improvement, [are] properly excluded from consideration in evaluating the property taken." (*People ex rel. Dept. Pub. Wks. v. Arthofer* (1966) 245 Cal.App.2d 454, 465 [54 Cal.Rptr. 878] (*Arthofer*).)

Where as here, the condemnation involves a partial taking of a larger parcel, there must be an appraisal both of the "before condition" and the "after condition." The property taken must, as explained above, be valued in the "before condition;" that is, as if the subject project had never taken place, without considering increases or decreases in its value caused by the project. (*Arthofer, supra,* 245 Cal.App.4th at p. 465; *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 926 [62 Cal.Rptr.2d 121].) The "after condition" refers to the reduction in value, if any, to the part of the remaining property that is caused by the condemnation. (*San Diego Metropolitan Transit Development Bd. v. Cushman, supra,* 53 Cal.App.4th at p. 926.) This is called "severance damages." (*Ibid.*) Moreover, where the value of the remaining property is *enhanced* by the project, the added value to the property can set off any severance damages. (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp., supra,* 16 Cal.4th at p. 698 [66 Cal.Rptr.2d 630, 941 P.2d 809].)

### III. *Analysis*

#### A. *Exclusion of the City's Zoning Restrictions*

The City first asserts that the court erred by excluding evidence of the zoning regulation that prevented RPP from obtaining a rezoning of their land from A-1-10 to higher density until the final alignment for SR-56 had been adopted by the City and it was determined if RPP's property would be taken for the SR-56 project. We reject this contention.

##### 1. *California case law supports the trial court's decision*

In *People ex rel. Dept. of Public Works v. Graziadio* (1964) 231 Cal.App.2d 525, 527-528 [42 Cal.Rptr. 29] (*Graziadio*), the State of California sought to condemn a portion of the defendant Graziadio's land located within the City of Fullerton (Fullerton) for construction of a highway. Although the defendant's property was zoned R-1 (single-family residential), most of the property had been marked as potential C-1 (commercial).

(*Ibid.*) Before the plaintiff department of public work's (DPW) institution of condemnation proceedings, the defendant submitted plans to Fullerton for a change in zoning to C-1. (*Id.* at p. 528.) During the time that the defendant's rezoning application was processed, the DPW determined that the route for a proposed highway had been selected, and it included a portion of Graziadio's property. The DPW notified Fullerton of this fact and requested that it leave the zoning for the parcel to be taken as R-1. (*Ibid.*) Fullerton's planning commission reported this communication to the Fullerton City Council and recommended that the parcel to be taken be permanently zoned R-1. (*Ibid.*) The Fullerton City Council adopted the recommendation into a zoning ordinance, restricting the property to be taken to residential use. (*Ibid.*) Fullerton rezoned the rest of the defendant's property C-1. (*Id.* at pp. 528-529.)

At trial in the condemnation action, the defendant's expert witness testified that the highest and best use for the property was a commercial shopping center and placed a value of $168,000 on the property. The defendant also testified that the highest and best use for the property was commercial and valued the property at $196,350. (*Graziadio, supra,* 231 Cal.App.2d at p. 528.) The plaintiff's expert testified at trial that the highest and best use was residential, and placed a value on the property of $157,500. The jury rendered a verdict of $158,000. (*Ibid.*)

On appeal, the defendant challenged the trial court's order excluding from evidence the communication from the DPW to Fullerton requesting that the property taken remain zoned R-1. (*Graziadio, supra,* 231 Cal.App.2d at p. 528.) The defendant argued that the letter was relevant as, but for the highway project, the defendant's property that was taken would have been rezoned to C-1 along with the property not taken. (*Id.* at p. 529.) The Court of Appeal agreed, based upon the rule (discussed, *ante*) that property condemned in an eminent domain proceeding must be valued as if the project had not taken place. (*Ibid.*)

Fullerton argued that only the actual zoning for the property (R-1) could be considered, not the higher valued C-1 because "the validity of a zoning ordinance cannot be challenged by the landowner in a condemnation action since this amounts to a collateral attack upon the action of a legislative body." (*Graziadio, supra,* 231 Cal.App.2d at p. 530.) The Court of Appeal disagreed because the communication from the DPW to Fullerton "was not offered to prove the invalidity of the ordinance but, rather, to prove that the ordinance which was admitted in evidence against defendant was enacted in contemplation of the taking for highway purposes. If property to be taken is

to be valued by the jury 'just as though there was no taking for highway purposes,' certainly the landowner must be permitted to introduce evidence tending to show that the zoning was predicated upon the taking." (*Ibid.*)

After the *Graziadio* decision the court in *People ex rel. Dept. Pub. Wks. v. Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960 [109 Cal.Rptr. 525] (*Southern Pacific*) refined the analysis of the use of zoning to freeze or depress prices of property to be condemned, where, as here, the entity that enacted the zoning ordinance and the condemning authority are the same. In *Southern Pacific*, the state sought to condemn land located within the City of Los Angeles that had previously been a railroad right-of-way. (*Id.* at p. 963.) The property owned by the defendant was zoned for agricultural use, even though the character of the area around the property had changed from agricultural to urban. (*Ibid.*) At trial, the defendant landowner sought to show that the zoning was put in place to prevent development of the land so that the City of Los Angeles could acquire the property at a low cost. (*Id.* at pp. 963-964.) The defendant argued that but for the eminent domain-related zoning ordinance the property would be zoned commercial and therefore evidence of the agricultural zoning should be excluded in the action brought by the state to condemn the property. (*Ibid.*) The trial court agreed, finding that the city's zoning was " 'discriminatory, confiscatory and invalid.' " (*Id.* at p. 965.) The trial court ruled that " 'upon the trial of this action the parties may offer evidence of the fair market value of subject property as though its use were unrestricted by zoning ordinance [and] that all evidence of the fair market value of the subject property based in whole or in part upon its present zoning be excluded at trial.' " (*Ibid.*)

The state appealed and the Court of Appeal reversed, but only on the basis that the condemner (the state) was not the same entity that enacted the zoning ordinance (the city). The Court of Appeal first noted that while "in most situations a collateral attack upon zoning is not permitted in an eminent domain proceeding [citation], that principle is inapplicable to the situation where the condemner purporting to exercise its police power by enacting a zoning ordinance has in reality discriminated against a particular parcel or parcels of land in order to depress their value with a view to future takings in eminent domain. [Citations.] In such a situation the condemnee may attack the validity of the invalid zoning ordinance in the eminent domain action and if successful require that his property be valued free of its restrictions." (*Southern Pacific, supra,* 33 Cal.App.3d at p. 965.)

Of particular importance to our case, the Court of Appeal then held, "Thus, if the eminent domain action which is the case at bench had been

commenced or prosecuted by the City of Los Angeles, the ruling of the trial court excluding evidence of existing zoning would have been correct." (*Southern Pacific, supra,* 33 Cal.App.3d at p. 965.) As the court explained, where the zoning authority and the condemning authority are different entities, the landowner would have a right to bring a direct action for inverse condemnation for its damages against the zoning authority and at the same time receive just compensation from the condemning authority in a separate action. (*Ibid.*) However, "[i]t is practical and logical to require that such invalid zoning be disregarded where the zoning authority is also the condemner. Permitting recovery in eminent domain disregarding the zoning restriction combines in one action the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property. The process avoids separating the matter into two causes involving the same subject matter and the same parties. Moreover, the condemning authority is also the zoning government so that much of the vice of a collateral attack on zoning in the usual eminent domain proceeding is not present." (*Id.* at p. 966.)

In contrast, admission of the zoning ordinance that was designed to freeze or depress the price of the property for later acquisition was proper in actions where the condemning and zoning authorities were *not* the same: "To require that the city's zoning which was an inverse condemnation by that body be disregarded here shifts the financial burden of the disguised taking from the city to the state. It permits a condemnee which failed to pursue its remedies for inverse condemnation against the city to recover compensation from an entity not directly responsible for the damage compensated." (*Southern Pacific, supra,* 33 Cal.App.3d at p. 966.) The court cited *Graziadio* in support of its decision and in doing so stated that the zoning ordinance by Fullerton in that case "would have been barred from evidence had the condemnation been brought by the city" as opposed to the state. (*Id.* at p. 967.)

 Here, we have a zoning restriction imposed by the City, the express purpose of which was to prevent development in areas that might later be condemned for the SR-56 project. Thus, this zoning restriction falls squarely under the rule set forth in *Southern Pacific* that evidence of a zoning restriction is inadmissible to show a lower value to the condemned property where (1) the restriction is imposed to freeze or depress the value of land that a governmental agency seeks to condemn, and (2) the same entity is both the condemner and the authority responsible for that restriction.

The City attempts to distinguish *Southern Pacific.* The City asserts that its holding was dictum. This is incorrect. The Court of Appeal's analysis of the

circumstances under which a city's building restriction is admissible provided the analytical and legal basis for the court's ultimate decision that the zoning ordinance in that case was admissible because the zoning authority and the condemning authority were not the same. The court's analysis of the circumstances under which such a building restriction was *not* admissible was necessary to the court's ultimate decision, and relevant to the facts presented here, and therefore was not dictum. (See *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 834-835 [209 Cal.Rptr. 16].)

Further, even if the portion of the *Southern Pacific* case relied upon by the trial court and RPP could be considered dictum, we find the reasoning in *Southern Pacific* persuasive. We are persuaded not only by the reasons stated in *Southern Pacific*, but also by the policies underlying eminent domain law. The City ignores established law that a condemned property is to be valued as if the project for which the land is taken did not exist. (*Arthofer, supra,* 245 Cal.App.2d at p. 465 ["changes in land use, to the extent that they were influenced by the proposed improvement, [are] properly excluded from consideration in evaluating the property taken"]; § 1263.330.) Thus, the City cannot enact restrictions on property it seeks to condemn for the express purpose of preventing development and thereby freeze or depress property values, and then attempt to show that that same zoning restriction prevents a highest and best use inconsistent with its terms. Such a position is contrary to established eminent domain law.

The City also attempts to avoid *Southern Pacific*'s holding by asserting that in this case the zoning restriction was enacted in good faith and not to depress land values as in *Southern Pacific*. In support of this contention, the City attempts to explain at length how the zoning restrictions were a valid exercise of its police power, "good planning," and a proper designation of land for future acquisition. This contention is unavailing. There is no need to find that the City's enactment of the zoning restriction was in "bad faith" or an unlawful exercise of its police power or zoning authority. RPP was not in this case attempting to prove that the zoning restriction was invalid, but only that it could not be applied to a valuation of the property in this case because it was predicated upon the taking itself. (*Graziadio, supra,* 231 Cal.App.2d at p. 530.)

The City's focus upon its intent at the time the zoning ordinance was enacted and its assertion of necessary long-range planning is misplaced. Rather, the question is whether the City, as both the zoning and condemning agency, could later use that restriction in the condemnation proceeding to

attempt to limit the award of just compensation to the landowner. Our conclusion that the City cannot is not concerned with the City's good or bad faith at the time of enactment, but rather what is fair and just in calculating compensation to the landowner at the time of trial.

It is also a matter of practicality. As the court in *Southern Pacific* explained, where the zoning and condemning agency are the same it is more practical to combine in one action "the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property." (*Southern Pacific, supra,* 33 Cal.App.3d at p. 966.)

Further, the record does not support the City's assertion that the excluded zoning restriction was not meant to freeze or depress property values on property it was to acquire through eminent domain. The terms of the restrictions state clearly that they were designed to prevent development on land that might later be condemned. The City's most knowledgeable person concerning the intent of the restriction testified that it was designed to ban development "inconsistent" with the proposed freeway. The ban did not apply to properties not needed for the SR-56 project; such properties could be upzoned from agricultural upon application. The obvious import of this evidence was that the City was attempting to prevent development on properties subject to possible condemnation in order to freeze or depress values. Indeed, the City offers no other explanation for the zoning restriction. At the hearing on RPP's motion in limine to exclude the zoning restrictions, the court gave the City the opportunity to present evidence that the restrictions had another intent or purpose. The City never did so.

In sum, we agree with the *Southern Pacific* holding that where the condemning agency and zoning authority are the same, zoning restrictions on property to be condemned that are enacted to freeze or depress land values of property to be condemned should not be considered in the valuation of that property. Accordingly, the court did not abuse its discretion in this case by excluding evidence of the City's restrictions on RPP's land that prevented development until the SR-56 project was approved.

2. *Out-of-state authority and secondary sources support the court's ruling*

The question of whether a condemning agency may enact a zoning restriction to freeze or depress the value of land to be condemned has been addressed in reported decisions cases from several other states and has been discussed in secondary sources. These authorities all provide further support for the court's ruling.

As stated in Annotation, Zoning as a Factor in Determination of Damages in Eminent Domain (1966) 9 A.L.R.3d 291, 304-305, "[m]any courts have vigorously condemned as confiscatory the action of a public body in adopting a zoning regulation or denying a petition for rezoning merely for the purpose of decreasing land value or preventing its proper utilization, in order to lower acquisition costs in eminent domain proceedings." (Fn. omitted.)

Further, out-of-state cases have adopted exactly the rule enunciated in *Southern Pacific*, that a zoning ordinance that freezes or depresses land values may not be used by the condemning agency to establish the lower value in a condemnation proceeding where the condemning authority also enacted the zoning restriction: "Although in most situations a collateral attack upon zoning is not permitted in an eminent domain proceeding [citation], that principle is inapplicable to the situation where the condemnor purporting to exercise its police power by enacting a zoning ordinance has in reality discriminated against a particular parcel or parcels of land in order to depress their value with a view to future takings in eminent domain. [Citations.] In such a situation such action has been vigorously condemned as confiscatory and the condemnee may attack the validity of the zoning ordinance in the eminent domain action and if successful require that his property be valued free of its restrictions." (*Department of Public Wks. & B. v. Exchange Nat. Bk.* (1975) 31 Ill.App.3d 88 [334 N.E.2d 810, 818].)

For example, in *Board of Com'rs of State Inst. v. Tallahassee B. & T. Co.* (Fla.Dist.Ct.App. 1958) 108 So.2d 74 (*Tallahassee Bank*), the plaintiff filed an eminent domain action to acquire residentially zoned property for expansion and development of Florida's "Capitol Center." (*Id.* at pp. 76-77.) Evidence was presented that the City of Tallahassee had previously adopted a zoning plan for the property needed for development of the Capitol Center that limited the use of the defendant's property to residential, while properties in the surrounding area were zoned commercial. (*Id.* at pp. 78-79.) The trial court held that the zoning was done to avoid an increase in acquisitions costs in eminent domain proceedings and that the property should be valued as commercial property without reference to the city's limitation to residential use. (*Id.* at p. 80.)

The Florida Court of Appeal affirmed this decision, holding that a condemnee was entitled to a valuation of his or her property without regard to zoning restrictions that are designed to minimize future acquisition costs in eminent domain proceedings. (*Tallahassee Bank, supra,* 108 So.2d at pp. 81-82.) In so doing, the court ruled that the trial court did not impermissibly set aside a valid zoning restriction, but rather was only allowing the

property owner to have his or her property valued at a higher use than that permitted by zoning restrictions that attempted to limit development and depress land values for future acquisition. (*Id.* at p. 82.)

In *Department of Public Wks. & B. v. Exchange Nat. Bk., supra,* 334 N.E.2d 810, the State of Illinois filed an eminent domain action to acquire land needed for construction of a state highway. While adjacent property was zoned for multifamily residential and commercial, zoning ordinances limited use of property needed for the freeway, such as the defendant's property, to single-family residential. (*Id.* at pp. 814-815.) The trial court instructed the valuation expert witnesses to value the defendant's property, based upon its single-family residential zoning designation, and the Illinois Court of Appeal reversed. The appellate court held that the property should have been valued at its highest and best use for multifamily and commercial uses. (*Id.* at pp. 816-818.) The court reasoned that the zoning restrictions on the defendant's property should not be considered because they were designed to "depress or limit property values in order to minimize the costs of acquisition of such property in anticipated condemnation proceedings." (*Id.* at p. 819.)

In *Business Ventures, Inc. v. Iowa City* (Iowa 1975) 234 N.W.2d 376 (*Business Ventures*), Iowa City filed a condemnation action to acquire 2.5 acres of a total of 34.6 acres owned by Business Ventures, Inc. (*Id.* at p. 378.) The property was zoned for farming and residential uses, but the owners had on numerous occasions attempted to have the property zoned for commercial uses. (*Id.* at pp. 378-379.) The evidence at trial demonstrated that the city had denied these applications, at least in part, because it wished to acquire the property as open space. (*Id.* at p. 379.) Accordingly, at trial the court allowed the landowners to value the property taken by the city without regard to the existing zoning. (*Id.* at p. 380.)

Iowa City appealed, asserting that the trial court erred by allowing Business Ventures, Inc., to collaterally attack the applicable zoning ordinance and value its property without regard to that zoning. (*Business Ventures, supra,* 234 N.W.2d at p. 380.) The court of appeal disagreed. Citing *Southern Pacific, supra,* 33 Cal.App.3d 960, the Iowa Supreme Court stated that it was proper to allow a condemnee to attack the validity of a zoning ordinance during an eminent domain proceeding when the zoning authority and the condemning authority are the same. (*Business Ventures, supra,* 234 N.W.2d at p. 381.) The court also held that because the existing zoning was designed to minimize the city's costs to acquire the property by eminent domain, the property was properly valued without consideration of the existing zoning. (*Id.* at p. 384.)

Federal courts have reached the same result. In *U.S. v. Certain Lands in Truro, etc.* (D.Mass. 1979) 476 F.Supp. 1031 (*Truro*), the federal government sought to acquire for the Cape Cod National Seashore project by condemnation several tracts of land that were zoned for three-acre minimum lot size. (*Id.* at pp. 1034-1035.) The evidence at trial showed that the United States had pressured the Town of Truro to enact this zoning restriction because of its intended acquisition. (*Id.* at p. 1034.) The landowners argued that although the zoning restrictions were not invalid, they should not be considered when valuing their property in the eminent domain proceeding. (*Id.* at p. 1035.)

The district court agreed. The court first noted that because the Fifth Amendment to the United States Constitution requires the government to pay "just compensation" for property acquired through eminent domain, the properties could not be valued using existing zoning that was the product of the very project for which the properties were being taken. (*Truro, supra,* 476 F.Supp. at p. 1035.) The court held that changes in market value of properties, whether increases or decreases, attributable to the project for which the property was being taken must be ignored. (*Id.* at pp. 1035-1036.) The court concluded that the subject properties must be valued at the less restrictive zoning for properties outside of the project area. (*Id.* at p. 1036.)

Additionally, secondary authorities are in agreement with these authorities that a zoning restriction that seeks to minimize a condemning entity's costs in condemning property is improper and confiscatory. (1 Anderson's American Law of Zoning (4th ed. 1996) Legitimate Objectives of Zoning, § 7.31, pp. 820-821; 4 Nichols on Eminent Domain (2002) § 12C.03[1].)

All of these authorities strongly support the court's ruling in this matter excluding the zoning restriction preventing upzoning of RPP's property pending a determination of whether the City would condemn that property. In fact, the City in its briefs has ignored all the out-of-state and secondary authority cited by RPP in support of its position.

3. *Statutory authority to support the court's ruling*

The City asserts that (1) the court had no discretion to exclude the zoning restriction unless it was expressly excluded by statute; and (2) there is no statutory authority to support its exclusion. We reject these contentions.

The City relies on Evidence Code section 351 for the proposition that the court could only properly exclude the City's zoning restriction if exclusion was mandated by statute. Evidence Code section 351 provides: "Except as

otherwise provided by statute, all relevant evidence is admissible." However, this statute has no application here as the City's zoning restriction, as discussed, *ante*, is irrelevant to a determination of the fair market value of RPP's condemned property because it is project-related zoning that seeks to freeze or depress RPP's land value for future condemnation. The City's assertion that there must be explicit statutory authority for the court's exclusion of evidence of the zoning restriction is therefore without merit. Further, even if required, statutory authority does support the court's order.

As both parties acknowledge, section 1263.330 prohibits parties from relying on evidence of both increases in value attributable to the project and *decreases* in value "attributable" to the project or caused by "preliminary actions of the plaintiff relating to the taking of the property" in assessing the fair market value of condemned property. (§ 1263.330, subds. (a) & (c).) Thus, as the City asserts, RPP cannot rely on any impact that SR-56 has upon the condemned property that causes an increase in value, such as better traffic facilities, changes in zoning and the like. However, the City at the same time cannot impose a zoning restriction forbidding upzoning in order to preserve land for the SR-56 project, thereby depressing or freezing the land's value, and thereafter rely upon that project-related restriction to set a value on the project. It is undisputed that the sole reason for the restriction was the SR-56 project. It is clear that the zoning restrictions excluded by the court were to be used by the City to show a "decrease in the value of the property that is attributable to . . . [¶] . . . [t]he project for which the property is taken" or "preliminary actions of the plaintiff relating to the taking of the property." (§ 1263.330, subds. (a) & (c).)

As the Law Revision Commission comment to section 1263.330 notes, prior to its adoption, "case law held that, in general, increases in the value of property caused by the project may not be included in the compensation." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1263.330, p. 61.) However, the comment goes on to acknowledge that prior to section 1263.330's enactment, "case law was uncertain respecting the treatment of any decrease in value . . . ." (Cal. Law Revision Com. com., *supra*, at p. 62.) The uncertainty was resolved by the Legislature in subdivision (a), which was "intended to make the rules respecting appreciation and depreciation parallel . . . ." (Cal. Law Revision Com. com, *supra*, at p. 62.)

The City argues that section 1263.330 is inapplicable because the zoning restrictions at issue in this matter were put in place several years before the EIR for SR-56 was approved. The City contends that the zoning restriction

cannot be considered as even "preliminary actions [of the plaintiff] relating to the taking of the property" because at the time the zoning restriction was put in place the SR-56 project was not "imminent" or "impending." We reject this contention.

There is nothing in the language of section 1263.330 stating that an eminent domain proceeding must be "imminent" or "impending" for an action by the plaintiff to be considered a "preliminary action" related to the taking of the property. Subdivision (c) of section 1263.330 is a codification of the case *Buena Park School Dist. v. Metrim Corp.* (1959) 176 Cal.App.2d 255 [1 Cal.Rptr. 250] (*Metrim*). (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra*, foll. § 1263.330, p. 63.) That case held that, consistent with the rule expressed above, "[I]n arriving at the fair market value it is necessary that the jury should disregard not only the fact of the filing of the case but *should also disregard the effect of steps taken by the condemning authority toward that acquisition.* To hold otherwise would permit a public body to depress the market value of the property for the purpose of acquiring it at less than market value." (*Metrim, supra,* 176 Cal.App.2d at p. 259, italics added.) This broad statement would appear to include such actions as were taken here, a zoning restriction put in place as a preliminary action related to the taking of the property, done in order to freeze or depress the value of the land.

The Law Revision Commission comment does use the words "imminence" and "pendency." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra*, foll. § 1263.330, pp. 61 & 62 ["Section 1263.330 . . . requires that the compensation for property taken by eminent domain be determined as if there had been no enhancement or diminution in the value of property due to the *imminence* of the eminent domain proceeding" and "[p]rior case law was uncertain respecting the treatment of any decrease in value due to such factors as general knowledge of the *pendency* of the public project" (italics added)].) However, as noted above, the express language of the statute contains no such limitation. Moreover, the City's most knowledgeable person, Anna McPherson, testified that the prohibition on upzoning was enacted with the intent that it would prohibit development that would conflict with the future alignment of SR-56. When the regulations were put in the Torrey Highlands Subarea Plan and the Torrey Highlands Public Facilities Financing Plan in August and October 1996, planning for the project was well under way. The traffic capacity analysis for SR-56 was completed in May of that year. The draft EIR was circulated in December 1996. Thus, the court would be within its discretion to find that the zoning restriction on RPP's property, which prevented development to reserve

property for the SR-56 project, constituted "preliminary actions" by the City related to the condemnation of RPP's property.

Further, it is irrelevant whether or not the zoning restriction technically fell within the terms of section 1263.330. At a minimum, section 1263.330 lends support to the general common law rule expressed in *Southern Pacific* that a zoning restriction intended to freeze or depress the value of the land to be condemned may not be used by the condemning authority to establish the value of the property as the court is required to "disregard the effect of steps taken by the condemning authority toward that acquisition." (*Metrim, supra,* 176 Cal.App.2d at p. 259.)

### 4. *The court did not take the "before condition" issue from the jury*

The City asserts that the court, in excluding evidence of its zoning restriction on RPP's property, effectively took the issue of the value of the condemned property in the "before condition," i.e., without regard to the SR-56 project, away from the jury. We reject this contention.

In support of its assertion, the City cites to *Coachella Valley Water Dist. v. Western Allied Properties, Inc.* (1987) 190 Cal.App.3d 969 [235 Cal.Rptr. 725] (*Coachella Valley*), in which the Court of Appeal reversed a trial court's decision that it, not the jury, should decide the value of the condemned property in the before condition: "We are cited to no case or statute which authorizes a court to take away from the jury the determination of the 'before condition' of property where, as here, that determination is the key question to be decided and there is conflicting evidence on whether the 'before condition' is tied to the [plaintiff's] specific project or some lesser improvement adequate for development of the property." (*Coachella Valley, supra,* 190 Cal.App.3d at pp. 975-976, fn. omitted.)

The Court of Appeal held that the trial court, by excluding evidence related to whether development of the subject property for residential or recreational use would have been conditioned on the landowner providing flood control facilities, which were the subject of the plaintiff's project, at its own expense, prevented the jury from fulfilling its duty to determine just compensation. (*Coachella Valley, supra,* 190 Cal.App.3d at pp. 974, 976.)

However, in this case the court did *not* take the "before condition" issue from the jury. We have already concluded that the court was correct in finding that the zoning restriction was imposed to prevent development of property to be condemned in order to prevent an increase in its value. Therefore, the zoning restriction was irrelevant to the value of the property in the before condition because it was predicated upon that very project.

## B. *Allowance of RPP's Experts' Testimony*

 Although the City asserts that the court was too restrictive in the evidence it allowed the City to utilize on the valuation issue, the City at the same time contends that the court was too expansive as to RPP's valuation evidence, allowing RPP's experts to rely on evidence of other properties that were allowed to upzone to higher density as the City contends that these rezonings were all caused or enhanced by the project itself. The City's contentions in this regard are threefold: (1) the evidence was inadmissible; (2) if admissible the court was required to also admit evidence of the City's zoning restriction to explain and rebut RPP's experts' conclusions; and (3) the admission of this evidence allowed RPP's experts to give "perjurious testimony" and counsel for RPP to make misleading arguments to the jury in closing arguments. We reject these contentions.

### 1. *Admissibility of evidence of other rezonings*

The City first asserts that the evidence of upzonings and sales of other properties relied upon by RPP's experts was inadmissible because the upzonings all were approved after RPP's property was designated as within the path of SR-56 and were therefore "attributable to" the project or "enhanced" by it. This contention is unavailing.

The City asserts that these upzonings could not have occurred but for the SR-56 project because they did not occur until after the EIR was certified, identifying which properties would be taken for the project, and which would thereafter be freed from the City's zoning restriction. However, this assertion ignores a couple of fundamental facts.

As already discussed in detail, the court properly excluded the zoning restrictions and barred the experts from relying upon them to determine value, including whether or not it was reasonably probable that RPP's property would be upzoned. Just as the City could not use its zoning restriction to show a lowered value for RPP's property, the City also could not limit the scope of RPP's experts' testimony by excluding upzonings that occurred after the zoning restriction was lifted.

Further, it was a question of fact for the jury, and the subject of argument by counsel, whether or not the other upzonings would have occurred even without the SR-56 project and, consequently, whether RPP's property also stood a reasonable chance of being rezoned. As detailed, *ante*, RPP's expert DeLorenzo discussed in detail the facts that supported his opinion that RPP's property enjoyed a reasonable probability of upzoning even without the

SR-56 project. This included other properties that he concluded received rezonings, not as a result of the SR-56 project, but rather as a result of housing demands and changing land uses in the area. Indeed, even the City's expert acknowledged that SR-56 was needed for regional transportation needs, not development in the area, and the vast majority of traffic on that freeway would be traffic moving between Interstate 15 and Interstate 5. That the City disagreed with RPP's experts' conclusions did not make them subject to exclusion. Whether the upzonings were "project-enhanced" as the City claims was a factual issue to be determined by the trier of fact.

The City cites *Arthofer, supra,* 245 Cal.App.2d 454, for its proposition that evidence of other upzonings should have been excluded. That case does not support the City's position.

In *Arthofer*, the State of California brought an action to condemn an unimproved parcel of real property owned by the defendants for the construction of a freeway. (*Arthofer, supra,* 245 Cal.App.2d at pp. 457-458.) The land was zoned R-1. Prior to the eminent domain proceeding the defendants had brought an application with the city to have the zoning changed to R-3, which was denied. (*Id.* at p. 459.) At trial, the defendants wanted to call two experts to testify as to the reasonable probability of a zone change for the property from R-1 to R-3. The defendants' valuation expert, however, testified that he had only discovered one other example of upzoning in the area, and admitted that it was the result of the freeway project itself. (*Ibid.*) The defendants' planning expert testified that he had only been retained two days before trial, and had no opinion as to the reasonable probability of a zone change. (*Id.* at p. 460.) The court sustained the state's objection to both experts' opinions as to the reasonable probability of a zone change. (*Ibid.*)

The owner appealed from the jury's verdict and the Court of Appeal upheld the trial court's ruling excluding the landowner's expert's testimony as to the reasonable probability of a zoning change. Framing the issue as "whether a sufficient foundation was laid to permit the owners' expert valuation witness and expert planning witness to express an opinion as to the reasonable probability of a zone change" (*Arthofer, supra,* 245 Cal.App.2d at p. 463), the Court of Appeal held that the trial court did not abuse its discretion in excluding the experts' opinions because they could not lay an adequate foundation for their testimony. (*Id.* at pp. 464-466.)

In support of its position that the experts' testimony in the instant case should also have been excluded, the City quotes the following rule expressed by the court in *Arthofer*: "Simply stated, the rule is that any testimony of

reasonable probability of zone change may not take into account the proposed freeway or any influence therefrom." (*Arthofer, supra,* 245 Cal.App.2d at p. 465.)

The parties do not dispute that *Arthofer* correctly expressed the rule excluding the effects of the project from opinions on value. Indeed, as we have already explained, this rule is the basis for the trial court's correct decision to exclude evidence of the City's zoning restriction. In citing this rule, the court in *Arthofer* was referring to the fact that the landowners' valuation expert *admitted* that the only other upzoning in the neighborhood had occurred because of the freeway project. That was not the case here, where RPP's expert testified that the other upzonings were *not* the result of the SR-56 project. Moreover, the *Arthofer* case did not involve a situation where a city prohibited rezoning of property because of a zoning ordinance that was designed to prevent construction on property the city wanted to condemn. The *Arthofer* case provides no support for the City's assertion that the court should have excluded RPP's experts' testimony to the extent it relied upon other examples of upzoning in the area.

### 2. *Necessity of evidence of zoning restriction to rebut RPP's evidence*

Nor is there any merit to the City's contention that once the court allowed RPP's experts' to rely on evidence of other upzonings in the area, it should have been allowed to rely on its zoning restriction to show that RPP's property should be valued at A-1-10 agricultural use. The City asserts that it should have been allowed to use this evidence to rebut RPP's claim there was a reasonable probability of rezoning for its property. However, this contention is merely a reiteration of its assertion made with regard to the court's initial decision to exclude the City's prohibition against upzoning. Again, the City was free to prove generally that RPP could not show a reasonable probability of a zoning change if the SR-56 project had never been built because no development would be anticipated or allowed without additional facilities allowing for increased traffic. However, the City could not base that contention upon the specific zoning restriction that prevented upzoning until it was known if RPP's property was to be taken. Again, this restriction was based specifically upon the project and was designed to prevent development, thereby depressing land value, in anticipation of condemnation.

### 3. *"Perjurious" testimony and misleading arguments*

Based upon our conclusions in this case, there is also no basis for the City's assertion that the court allowed RPP's expert to commit "perjury" and

RPP's attorney to make misleading arguments to the jury. All of the expert's testimony was to the effect that RPP's property stood a reasonable probability of upzoning and development without SR-56. As we have explained, this testimony was admissible based upon the substantial foundation laid by RPP's expert.

The City specifically points to testimony by RPP's expert DeLorenzo that there was no zoning restriction that would prevent an upzoning tied to the SR-56 project. However, this testimony was correct, given the court's proper ruling that the zoning restriction could not be considered in determining the value of RPP's property, including the issue of whether it had a reasonable probability of upzoning. In rejecting this argument at trial, the court correctly noted that for the purposes of the trial of this matter the expert witnesses were required to assume that the zoning restriction did not exist.

Nor was the argument by counsel for RPP misleading. As detailed above, the arguments went to the fact that the City's appraisal was discriminatory against RPP because it did not reflect other properties that were allowed to develop, and that the City's experts had originally based their opinions on inadmissible evidence. These statements were not misleading as they were based, correctly, upon the City's insistence that RPP's property could not be developed absent the SR-56 project and the excluded zoning restriction. The City chose to rely on this theory of valuation and cannot complain if RPP's attorney pointed out what he believed were weaknesses or inconsistencies in that theory.

### C. Court's Failure to Prepare Statement of Decision

The City also asserts that it was reversible error for the court to fail to provide a statement of decision for its decisions granting RPP's motion in limine and denying the City's. We reject this assertion.

Section 632 provides that a written statement of decision is required, if requested, "upon the trial of a question of fact by the court." However, it is well established that a statement of decision is ordinarily not required for a decision granting or denying a motion, including a motion in limine. (*Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 677-678 [78 Cal.Rptr.2d 225].)

There is a very limited exception to this rule. A statement of decision may be required on a motion ruling where the motion was in the nature of a "trial" of fact issues. (*Gruendl v. Oewel Partnership, Inc.* (1997) 55 Cal.App.4th 654, 660-661 [64 Cal.Rptr.2d 217].) Whether a statement of

decision is required in such a case depends upon the importance of the issues at stake, the significance of rights affected and magnitude of the potential adverse effect on these rights, and whether appellate review can effectively be accomplished even in the absence of express findings. (*Id.* at p. 660.) The City asserts that the court's rulings here fall within this exception. We disagree.

Here, the court's challenged rulings were not in the nature of a "trial" of factual issues. Rather, in granting RPP's motion in limine, the court was resolving a legal issue: whether under eminent domain law the City's zoning restriction on RPP's property was irrelevant and inadmissible in determining the value of RPP's property. The ruling denying the City's motion in limine, while it may have involved a review of factual issues related to the basis for RPP's experts' opinions, certainly did not involve trial of a factual issue. Finally, even if the City could fit this ruling within the narrow exception, the abundant record in this case and the extensive analysis by the court in open court in making its decision make it clear that a statement of decision was not necessary in order for this court to conduct an effective review of the court's ruling. The court did not err in failing to prepare a statement of decision in this case.

### DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and McConnell, J., concurred.

A petition for a rehearing was denied March 3, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 14, 2003.