[No. D044079. Fourth Dist., Div. One. Apr. 25, 2005.]

CITY OF SAN DIEGO, Plaintiff and Appellant, v.
BARRATT AMERICAN INCORPORATED et al., Defendants and
Respondents.

918

**COUNSEL**

Meyers, Nave, Riback, Silver & Wilson, David W. Skinner, Robert C. Chojnacki; Casey Gwinn, City Attorney, Leslie A. Fitzgerald and Claudia G. Silva, Deputy City Attorneys, for Plaintiff and Appellant.

Rutan & Tucker, Jeffrey M. Oderman, Douglas J. Dennington; Luce, Forward, Hamilton & Scripps and Steven S. Wall for Defendants and Respondents.

## OPINION

**McDONALD, J.**—In this eminent domain action plaintiff the City of San Diego (City) condemned 5.04 acres of real property (the taken property) within the North City Future Urbanizing Area (NCFUA) to construct the middle segment of the State Route 56 freeway (the Project), an east-west freeway that traverses the NCFUA. The taken property was part of a 38.47-acre parcel of property owned by defendants Barratt American Incorporated and others (Owners). The central issue below was how to value the taken property disregarding the influence of the Project on the value, as required by Code of Civil Procedure section 1263.330.[1]

City asserted below the taken property should be valued based on its "agricultural use" zoning (the zoning in place at the time it became probable the taken property would be acquired for the Project) because the proper method for disregarding the influence of the Project on the value of the taken property would assume the Project was abandoned on the valuation date (the abandoned Project construct). City asserted that as of the valuation date there was no probability the taken property would be upzoned in the near future because on the abandonment of the Project there was no transportation plan for the NCFUA; therefore the proper valuation for the taken property is based on agricultural zoning. Owners moved in limine to preclude City's appraisers from employing this hypothetical abandoned Project construct to assess whether, absent the Project, it was reasonably probable the taken property would have been upzoned prior to the valuation date. The trial court granted Owners' motion in limine, and City asserts this was error. City also asserts on appeal that one of Owners' methods of valuation, which disregarded the influence of the Project on the value of the taken property by assuming the Project had never been contemplated, and development pressures would have resulted in a planning process for the NCFUA (including an alternative transportation system) and upzoning by the valuation date, was too speculative to support Owners' valuation of the taken property.

City also asserts that Owners' alternative method of valuation, purportedly premised on *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1] (*Woolstenhulme*), requires reversal of the judgment because (1) the enactment of the California Environmental Quality Act (CEQA) effectively eviscerated *Woolstenhulme*; (2) even if *Woolstenhulme* survived CEQA, Owners' approach and the trial court's instruction were based on a misreading of *Woolstenhulme*; and, (3) the court's instruction on the *Woolstenhulme* issue was contradictory and confusing.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

We conclude the trial court correctly precluded City from using the abandoned Project construct to value the taken property, both of Owners' valuation methods were appropriate under the facts of this case, and the trial court's instructions to the jury were adequate.

I

FACTUAL BACKGROUND

A. *The Property and the NCFUA*

In late 1989 Owners acquired an approximately 38-acre parcel of unimproved land in the City within subarea III of NCFUA (Owners' land). The NCFUA, which included approximately 12,000 acres, was composed predominately of undeveloped land, with some scattered agricultural, nursery and low-density residential uses. The land within the NCFUA, including Owners' land, was zoned by City as "A-1-10 agricultural," which permitted one dwelling per every 10 acres, or, under a clustering option, one residence per every four acres. (*City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1019 [130 Cal.Rptr.2d 108] (*RPP*).) However, the NCFUA and the A-1-10 agricultural zoning were intended as interim rather than permanent designations for the area. The NCFUA was established to avoid premature urbanization, conserve open space, and avoid sprawl and leapfrog urban development. (*Id.* at pp. 1019, 1023.)

B. *The SR-56 Freeway*

In 1959 the California Legislature originally designated a proposed freeway that would provide a regional east-west link between Interstate 5 and Interstate 15 (SR-56). (*RPP, supra,* 105 Cal.App.4th at p. 1020.) By 1965 California approved the so-called "Central Alignment" for the proposed freeway, the middle portion of which is defined in this opinion as the Project. The Central Alignment for this 17-mile freeway showed SR-56 traversing a route considerably south of Owners' land. However, for many years thereafter, no further steps were taken to implement the construction of SR-56.

C. *The 1992 NCFUA Framework Plan*

By 1990 the demand for housing and the absence of available land caused City to consider releasing the NCFUA from its holding zone status. In October 1992, responding to the shortage of available land and the absence of an overall plan for the orderly development of the NCFUA, City adopted the "1992 Framework Plan" for the NCFUA, which was incorporated into the City's general plan. "The framework plan was designed to provide a blueprint

for the future urbanization of the NCFUA." (*RPP, supra,* 105 Cal.App.4th at p. 1019.) It called for a significant upzoning for the NCFUA, including Owners' land.

The Framework Plan continued to reflect only one proposed route for SR-56—the Central Alignment. Although the precise footprint and configuration for SR-56 within the NCFUA had not been finalized,[2] the Framework Plan contemplated that planning for higher density development within subarea III (in which Owners' land is located) and Subarea IV could proceed as long as the plans accounted for the fact that SR-56 would traverse those areas.[3]

### D. *Approval of Subarea IV Plan*

During the mid-1990's, detailed planning to implement the Framework Plan began with respect to subarea IV, located east of Owners' land. At the time the subarea IV plan was being prepared for submission to City and the voters for approval, City was also preparing a draft environmental impact report (DEIR) for SR-56[4] that evaluated both the Central Alignment and an alternative alignment (the Northern Alignment). In its December 1996 DEIR, City reiterated its preference for the Central Alignment, because, among other reasons, the Central Alignment was consistent with the Framework Plan, was a superior community planning design, and provided a more direct route.

Although the subarea IV plan provided *alternative* land uses for *some* of the parcels within the subplan area, depending on which alignment was

---

[2] For example, the Framework Plan recognized the NCFUA contained natural viewsheds, view corridors and panoramic views that should be considered in planning the area's road system because any "road system has the potential to disrupt natural features and block public views of the landscape. The most significant issue is the alignment of State Route 56. The alignment will be the subject of an environmental document which will investigate a number of alternatives. The relationship of the freeway to Santa Monica Ridge and Deer Canyon, both important natural features and localized viewsheds, should be a major consideration in selecting a final alignment" for SR-56.

[3] For this reason, the Framework Plan provided: " '2.6a Because of the importance of other planning efforts to the future of several NCFUA subareas, the following principles will govern timing of completion of subarea plans for individual subareas: [¶] . . . [¶] Subareas III and IV: The City will undertake an alignment study for SR-56. Subarea Plans for these areas may be approved, provided sufficient corridors are designated for alternative alignments for SR-56. *However, discretionary approval for development in these subareas shall not be approved prior to the adoption of the City's final alignment for SR-56.*' " (*RPP, supra,* 105 Cal.App.4th at p. 1020 [italics added by *RPP*].)

[4] The approvals for and construction of the freeway from Interstate 5 to Interstate 15 was divided into three segments. The eastern segment (running from Interstate 15 to Black Mountain Road) and western segment (running from Interstate 5 to Carmel Country Road) were completed by the end of 1995. The linking of these two ends was to be accomplished by constructing the middle segment of SR-56, the Project at issue in these proceedings.

ultimately selected, the subarea IV plan contemplated the same overall amount of residential and nonresidential development would occur in subarea IV regardless of whether SR-56 was built or which alignment might be selected. In 1996 City approved the subarea IV plan, and in November 1996 voters approved the subarea IV plan. As a result of these approvals, authorized residential land uses in subarea IV shifted from the A-1-10 designation to densities as high as 10 dwelling units per acre.[5] (*RPP, supra,* 105 Cal.App.4th at p. 1020.)

### E. *Evolution of the Subarea III Plan*

Between 1997 and 1998, a similar planning process was undertaken for subarea III. During this time, the ultimate alignment for the Project was still uncertain.[6] Accordingly, the subarea III plan (like the subarea IV plan) was drafted to respond to four possible alignments for the Project. However, it appears the plan permitted higher density development in subarea III, including Owners' land, under any of the four planned alignments. In the fall of 1998 City and the voters approved the subarea III plan.

### F. *Final Alignment for the Project*

By January 1998 City's DEIR identified four possible alignments for the Project. The footprint for two of those alignments—the original Central Alignment and "Modified Northern Alignment D"—were outside the boundaries of Owners' land, and the DEIR characterized Modified Northern Alignment D as the "environmentally superior" alternative. However, when City certified the final environmental impact report (FEIR) for the Project in

---

[5] The subarea IV plan included a clause precluding discretionary development approvals for parcels that could be affected by the final alignment of SR-56 but did not similarly limit development of unaffected parcels. (*RPP, supra,* 105 Cal.App.4th at pp. 1020–1021.) The impact of these provisions on the valuation of parcels within subarea IV acquired for SR-56 were the subject of this court's opinion in *RPP,* discussed below.

[6] The environmental review process had produced an even murkier picture of the final alignment for the Project. City responded to objections from various parties to the DEIR's recommended Central Alignment by identifying at least six new alternative alignments. Although City quickly eliminated four of those alternatives from detailed consideration, it concluded two of those new alternatives (denominated as Modified Northern Alignments D and F) were potentially viable and made those new routes the subject of a revised DEIR released to the public in January 1998. The revised 1998 DEIR also contained a change in City's recommended alignment: City changed its previously stated preference for the Central Alignment and effectively became neutral on which of the four alignments should be selected.

June 1998,[7] it selected (subject to concurrence by the California Transportation Commission)[8] Modified Northern Alignment F as the final alignment for the Project.

This selected alignment for the Project required City to condemn the taken property, consisting of 5.04 acres of Owners' land.

### G. *The March 2001 Upzoning of Owners' Land*

After City certified the FEIR and selected the final alignment for the Project, City began approving applications for upzoning in the affected areas. In March 2001 City approved an application permitting Owners to develop the Owners' land at a density of approximately six units per net developable acre, a density that conformed with the Framework Plan and the Subarea III Plan.

## II

## THE PRESENT LITIGATION

City filed this action to condemn the taken property in November 2001 and apparently made the deposit of probable just compensation on November 16, 2001, thereby fixing November 16, 2001, as the valuation date for the taken property. (§§ 1263.110, 1255.010.) Both parties were prepared to offer expert testimony valuing the taken property as of November 16, 2001, without considering the impact on value attributable to the Project, as required by section 1263.330. However, the methodology employed by the respective experts to disregard the impact of the Project on value was significantly different. Additionally, Owners proffered an alternative theory for valuing the taken property that proposed to disregard the impact of the Project only after June 1998 asserting, under *Woolstenhulme, supra,* 4 Cal.3d 478, any change in the taken property's value caused by the Project that occurred before the June 1998 probable inclusion date[9] was compensable. The trial court's rulings on these issues are the subject of this appeal, and we therefore examine the respective approaches proffered by the parties.

---

[7] At trial, the parties stipulated the June 1998 certification of the FEIR established the latest "date of probable inclusion" of the taken property into the Project within the meaning of *Woolstenhulme, supra,* 4 Cal.3d 478.

[8] The California Transportation Commission (CTC) is the state agency with exclusive jurisdiction over approval of the routes for state freeways. (Sts. & Hy. Code, §§ 70(a), 100.1, 100.2, 100.3.) In November 1999, the CTC approved the Modified Northern Alignment selected by City.

[9] See discussion of *Woolstenhulme* at part III.B., *post.* City certified the FEIR for the Project in June 1998. (See fn. 7, *ante.*)

## A. *The Competing Alternative Reality Theories*

### *Owners' Methodology*

Owners' hypothetical construct for disregarding the impact of the Project on the value of the taken property was founded on the fiction that the Project had never been conceived or planned (the no Project construct). They asserted that development pressures and the need to implement a long list of City's land use priorities would have caused City to remove the NCFUA and subarea III from its agricultural *holding* status to permit higher density development even without the Project, and the traffic circulation needs for this higher density use would have been solved through an alternative design of surface streets substituted for the absent Project. Accordingly, Owners' experts believed it was reasonably probable the taken property would have been upzoned by the valuation date even without the Project.

### *City's Methodology*

City's hypothetical construct for factoring out the impact of the Project on the value of the taken property, the abandoned Project construct, was founded on the fiction that the Project was abruptly abandoned on the November 16, 2001 valuation date. City's construct posited that the Project had been a lynchpin in the NCFUA planning process because of its irreplaceable role in handling the traffic that would accompany higher density development in the NCFUA. City's experts asserted, because this was the actual *before condition* of the taken property, an approach that would properly disregard the impact of the Project on the value of the taken property as of the valuation date would be to assume the Project, although planned for years, was canceled in November 2001. Without the Project, there would be no system to handle the traffic created by higher density development in the NCFUA, and therefore City would have to place a moratorium on all upzoning until a new traffic system was developed.[10] City's experts were of the opinion it would be at least five years after November 2001 before a transportation and circulation system to replace the abandoned Project could be designed and implemented, and therefore there was no reasonable probability that, without the Project, the taken property would have been upzoned in the near future.

---

[10] Although it is not germane to our analysis, we note the hypothetical date of abandonment was several months *after* City approved Owners' land for development at peripheral residential densities, and there is no explanation of how the hypothetical moratorium would impact the valuation of land with previously approved development levels.

*Trial Court Ruling*

Owners moved in limine to preclude City's experts from valuing the taken property using the abandoned Project construct. The trial court granted Owners' motion.

B. *The* Woolstenhulme *Valuation Theory*

Although a landowner is generally barred from obtaining the project-enhanced value of the property being condemned, Owners' experts sought to invoke the *Woolstenhulme* exception to this project enhancement rule as an alternative basis for valuing the taken property. Owners argued *Woolstenhulme* applied because the Project had been planned to traverse the Central Alignment (an alignment south of Owners' land) for over 30 years. That alignment remained the *only* articulated route until City released its December 1996 DEIR, after adoption of the Framework Plan that established land within the NCFUA would be accorded higher density development. Moreover, because City continued to support the Central Alignment as the preferred route until it issued its January 1998 revised DEIR, and because City's January 1998 revised DEIR still described the Modified Northern Alignment D as the environmentally superior alternative, Owners argued the taken property was enhanced in value by the proposed Project up until the June 1998 probable inclusion date, when City adopted the Modified Northern Alignment F, which required condemning the taken property. Owners' experts sought to testify that any appreciation in the value of the taken property, insofar as it was attributable to probable upzoning facilitated by the Project, had already attached before the Project was changed to include the taken property, and that appreciated value was compensable under the *Woolstenhulme* exception.

City moved in limine to preclude Owners' experts from invoking the *Woolstenhulme* exception as part of their valuation analysis. City asserted the *Woolstenhulme* exception did not (and as a matter of law could not) apply to a project that requires compliance with CEQA because there can be no project until the environmental review process is final; therefore in this case the taken property was never outside of the Project. City also argued, unless there was a reasonable expectation the taken property would be outside the scope of the Project before it is included in the Project, the *Woolstenhulme* exception cannot apply.

The trial court denied City's motion in limine.

C. *Trial Proceedings*

The parties offered competing valuations for both the taken property and for severance damages.

*Owners' Valuation Evidence*

Owners' experts testified that under the no Project construct, the taken property enjoyed a reasonable probability of an upzoning to the higher densities permitted under the subarea III Plan. Owners' planning expert, Mr. DeLorenzo, testified that upzoning in the NCFUA, including Owners' land, was not dependant on the Project. He noted the A-1-10 zoning was not intended to be permanent, and the need to provide housing (as well as other significant public policies furthered by the Framework Plan) would have resulted in an upzoning of Owners' land consistent with the Framework Plan even without the Project, and the traffic generated by these increased densities would have been accommodated by designing a surface street system connecting to the existing eastern and western segments of SR-56. (See fn. 4, *ante*.) Because the policies and goals of the Framework Plan would have been frustrated by keeping the NCFUA for low density development, DeLorenzo testified that even without the Project "there was not only a reasonable probability that this land would develop consistent with the plans that we all prepared over time, but actually a very high degree of probability." In addition to the no Project construct, DeLorenzo also testified (under *Woolstenhulme*) that the taken property had a reasonable probability of being upzoned to peripheral residential densities by the November 2001 valuation date based on the planned Central Alignment for the Project, although he disregarded any additional enhancement in the value of the taken property that occurred after the June 1998 probable inclusion date.

Owners' expert appraiser, Mr. Waldron, reached the same conclusion to support his opinion the taken property should be valued at its highest and best use at peripheral residential (rather than agricultural) zoning densities. He cited several examples of areas in San Diego County developed at similar densities without a freeway serving the development, and he agreed with DeLorenzo's conclusion that demand for housing, as well as numerous public policies reflected in the Framework Plan (e.g., the need to meet housing demand and for affordable housing, the desire to achieve clustered development and avoid piecemeal or leapfrog development, and the need to have enough development to defray the costs of the associated infrastructure) would have resulted in an upzoning of the taken property to levels consistent with the subarea III plan even without the Project.

Waldron's opinion that the taken property should be valued at a peripheral residential zoning density was alternatively founded on *Woolstenhulme*. He testified the taken property was within the areas designated for peripheral residential densities under the Framework Plan and the subarea III plan, and both of those plans originally showed the taken property to be outside of the Project. Accordingly, to the extent the Project influenced the market value of

the taken property, the value (including its value as land prospectively developable at peripheral residential densities) had attached to it prior to the June 1998 probable inclusion date, and that increase in value was properly considered in valuing the taken property. However, he excluded from his calculus any additional enhancement in the value of the taken property resulting from the Project after the June 1998 probable inclusion date.

Waldron testified the fair market value of the taken property in the before condition, as developable at peripheral residential densities of between 5 and 9 units per acre, was $1.05 million per acre and therefore valued the taken property at $4,823,650. He also testified that the Project resulted in severance damages of $851,350, and there were no offsetting benefits to the remainder parcel.

### City's Valuation

City, barred by the in limine ruling from using the abandoned Project construct to value the taken property, adopted the assumption that the Project had never been planned. City's planning expert hypothesized, without the Project, the planning process would have resulted in a plan limiting development in the NCFUA to an overall average of one unit per two gross acres, in part because any higher density build-out of the NCFUA without the Project would overburden traffic circulation systems.[11]

City's appraiser, Mr. Roach, testified that without the Project the taken property would have been developable at a density of one unit per two gross acres. Based on this development density he valued the taken property at $400,000 per net developable acre in its before condition, valued the taken property at $2,016,000, and testified that amount was the just compensation for the taken property. On the issue of severance damages, Roach concluded the adverse impact of the Project diminished the value of the remainder land by approximately $130,000 per acre, for a total "loss" of nearly $1.5 million. However, he also opined the offsetting benefits of the Project (e.g., permitting the land to be developed at higher densities) added over $6 million in value to the remainder parcel, and therefore there were no net severance damages.

---

[11] City's traffic expert, Mr. Halbert, explained that when SR-56 is completed it will handle approximately 120,000 trips per day, approximately 40,000 of which would be from the new developments within the upzoned NCFUA. He testified that, without the Project, the surface streets within the NCFUA would be vastly over capacity. However, on cross-examination, he seemed to concede that sufficiently wide expressways and major roads would handle more trips per day than the 40,000 trips per day of locally-generated traffic the completed SR-56 was expected to absorb.

D. *The Instructional Issue*

The court instructed the jury, over City's objection, with a version of BAJI No. 11.77 modified to accommodate the general rule against valuing the taken property based on changes to the value caused by the Project, and the *Woolstenhulme* exception to the general rule, which exception permits increased value of the taken property that attached before the probable inclusion date. The court instructed:

"In determining the fair market value of the property, do not include any change caused by the proposed improvement, that is, the use which the plaintiff is to make of the property. In this regard, once again, the proposed improvement consists only of Unit 2 of the middle segment of State Route 56. . . ."

"*However, in determining the fair market value of the property you must include any increase in the market value of the property, if any, caused by the proposed improvement that occurred before [June 1998]. In this regard, in determining the highest and best use of the property, you must consider whether the improvements proposed or contemplated for the SR-56 freeway prior to [June 1998], including any alternative alignments previously adopted or considered by the governing agencies, would have increased the probability that the property's zoning would have been changed within the near future as of the November 16, 2001 date of value.*"[12] (Italics added.)

City objected to the italicized portion of the instruction, asserting it misstated the law on the *Woolstenhulme* exception. City also asserted the instruction was hopelessly confusing because it instructed the jury to ignore the Project's impact on value after June 1998, but also instructed that the jury could consider whether any alternative designs for the Project prior to June 1998 increased the likelihood of an upzoning as of the November 2001 date of valuation. The court overruled City's objections, and instructed the jury as quoted above.

[12] The court gave the *Woolstenhulme* aspect of this instruction on two occasions. In addition to giving the entire quoted instruction in its charge to the jury, the court also gave the italicized portion of the instruction during the evidentiary portion of the trial. During trial, Roach (City's expert appraiser) testified on cross-examination that his appraisal was based on the assumption that the Project was never planned, and he excluded from consideration any enhanced value from the planned Central Alignment because he concluded there could be no project enhancement until after the final alignment was approved in the June 1998 FEIR. Owners moved to strike Roach's testimony, arguing that by not accounting for the *Woolstenhulme*-authorized pre-June 1998 appreciation, he had not "performed his appraisal in compliance with the eminent domain rules." The court denied the motion to strike, but instead concluded, "in light of the testimony of Mr. Roach," it was appropriate to provide immediate guidance to the jury on the applicable rules concerning project enhancement, and therefore gave the italicized portion of the instruction during trial.

### E. *The Verdict and Posttrial Proceedings*

The jury concluded the fair market value of the taken property was $3.5 million, a figure approximately midway between the competing valuations proffered by the parties. It also found severance damages were $851,350, with no offsetting Project benefits, as urged by Owners.

City moved for a new trial, asserting the jury instruction was erroneous as a matter of law and was inconsistent with the court's in limine rulings. The court denied the new trial motion.

### III

### APPLICABLE PRINCIPLES

### A. *Fair Market Value*

■ The parties do not dispute the broad outlines of the principles governing the determination of fair market value. Eminent domain principles arise from the fundamental requirement that private property shall not be taken for a public use without just compensation, which must put the owner "in as good position pecuniarily as [the owner] would have occupied if [the] property had not been taken. [Citations.]" (*Ventura County Flood Control Dist. v. Campbell* (1999) 71 Cal.App.4th 211, 218–219 [83 Cal.Rptr.2d 725].)
■ Section 1263.310 provides "[t]he measure of this compensation is the fair market value of the property taken," and section 1263.320, subdivision (a) defines fair market value as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

■ The analysis of the fair market value of a property being condemned in an eminent domain proceeding begins with a determination "of the highest and best use to which the property being condemned can be put." (*San Diego Gas & Electric Co. v. Daley* (1988) 205 Cal.App.3d 1334, 1344 [253 Cal.Rptr. 144], disapproved on other grounds in *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720 [66 Cal.Rptr.2d 630, 941 P.2d 809].) Importantly, the "determination of the property's highest and best use is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner 'is entitled to show a reasonable probability of a zoning [or other change] in the near future and thus to establish such use as the

highest and best use of the property. [Citations.]' [Citations.] The property owner has the burden of showing a reasonable probability of a change in the restrictions on the property." (*County of San Diego v. Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1058 [20 Cal.Rptr.2d 675].)

B. *Fair Market Value Impacts of the Project*

*General Rule—Disregarding the Project's Impact on Value*

■ Although a property owner is entitled to receive the fair market value of the property condemned, the owner is not entitled to more. (*City of Carlsbad v. Rudvalis* (2003) 109 Cal.App.4th 667, 678 [135 Cal.Rptr.2d 194].) Accordingly, when assessing fair market value (including its highest and best use and the reasonable probability of a zoning change), any increase or decrease in the property's value *caused by the project for which the property is condemned* may not be considered. Thus, to the extent the fair market value of the property condemned increases or decreases because of the project for which it is condemned, or the eminent domain proceeding in which the property is taken, or any preliminary actions of the condemnor relating to the taking of the property, such project-caused increases or decreases must be excluded from the just compensation calculus. (§ 1263.330.) As this court recently reaffirmed: " 'Simply stated, the rule is that any testimony of reasonable probability of zone change may not take into account the proposed [project] or any influence arising therefrom. [Citations.] The probability of rezoning or even an actual change in zoning which results from the fact that the project which is the basis for the taking was impending cannot be taken into account in valuing the property in a condemnation proceeding. [Citations.] . . . Therefore, changes in land use, to the extent that they were influenced by the proposed improvement, [are] properly excluded from consideration in evaluating the property taken.' " (*RPP, supra,* 105 Cal.App.4th at pp. 1028–1029, quoting *People ex rel. Dept. Pub. Wks. v. Arthofer* (1966) 245 Cal.App.2d 454, 465 [54 Cal.Rptr. 878].)

*Woolstenhulme* Exception—Appreciation Before Probable Inclusion Date

■ In *Woolstenhulme, supra,* 4 Cal.3d 478, the court concluded that under limited circumstances, a property owner *may* properly be compensated for the increase in value the property experienced in anticipation of the benefits of a proposed improvement, so long as it was not reasonably probable the property being evaluated was anticipated to be taken for the improvement. In *Woolstenhulme,* the condemnor for many years had been developing plans for a new water project that would significantly increase the size of an artificial lake, the impact of which would provide neighboring

properties with power, water, and increased recreational facilities. By early 1963 the public learned of the general recreation plans and as a result property values in the area began to increase, although the precise footprint of the project was unknown. However, by January 1, 1965, the plans for the project had progressed to a point at which it became "reasonably probable" the defendant's property would be taken for the project. (*Id.* at pp. 484–485.)

■ The issue was whether the property owner was entitled to be compensated for the project-caused enhancement in value that accrued to the property before it was targeted for acquisition.[13] The court concluded that "under our just compensation clause, an owner of the condemned property should be compensated for the increase in value [that] his land has experienced in anticipation of the benefits of a proposed improvement, so long as it is not reasonably probable that the specific piece of property being evaluated is to be taken for the improvement." (*Woolstenhulme, supra,* 4 Cal.3d at p. 487.) The court, addressing the general rule that increases in property values that frequently accompany the announcement of a desirable public improvement constitute project-enhanced value for which the property owner is never entitled to be compensated, refined the concept by distinguishing three different types of project-enhanced value: "The value of land can be said to increase 'by reason of the proposed improvement' (*County of Los Angeles* v. *Hoe* (1955) 138 Cal.App.2d 74, 78 [291 P.2d 98]) for at least three distinct reasons: (1) the worth of *property known to be within the project* may rise when the land is valued *as part of* the proposed improvement rather than as a separate tract of land; (2) the value of *property expected to be condemned* may rise because of the anticipation that the condemner will be required to pay an inflated price for the land at the time of condemnation; and (3) the value of *property expected to be outside of the proposed improvement* may rise because it is anticipated that the land will reap the benefits resulting from *proximity* to the coming project." (*Id.* at p. 490, original italics.)

The court concluded that although the general rule against compensating a property owner for the project-enhanced value applies to appreciating value attributable to the first two scenarios, a property owner is entitled to be compensated for appreciating property value under the third scenario. (*Woolstenhulme, supra,* 4 Cal.3d at pp. 488–495.) The court synopsized the rationale for its holding by explaining: "In the early stages of a desirable project's development, land which is expected to be within the vicinity of the

[13] Although City suggests *Woolstenhulme* did not address the probability of zoning changes in the near future, *Woolstenhulme* was addressing the issue of the value-enhancing impact of a project on a property's highest and best use. In *Woolstenhulme*, the highest and best use of the property before consideration of the project was for cattle grazing, while the highest and best use of the property after the project was built was for development, and the dispute was over which highest-and-best-use value was the proper measure of just compensation. (*Woolstenhulme, supra,* 4 Cal.3d at pp. 485–486.)

project, but is not expected to be taken for the project, will naturally increase in value, and a landowner who chooses to sell such land at this time will gain the benefit of this incremental value; similarly, one who buys such land at this time must pay this incremental amount for his purchase. It is not until a particular piece of property is reasonably expected to be condemned for the project that this enhanced market value, attributable to the land's anticipated proximity to the improvement, disappears. We have determined that it would be unfair, in computing just compensation, to eliminate the appreciation in market value which a specific piece of property in fact enjoyed before it was designated for condemnation, since that would in effect deny to the owner the market value of his property prior to the time it was pinpointed for taking." (*Id.* at p. 484.)

Thus, assuming *Woolstenhulme* retains vitality after CEQA, it requires that when a prospective project causes a general rise in property values for property benefited by the project, the increase in value is compensable until it becomes reasonably probable the property will be taken for the project.

### C. *Standards of Review*

■ We apply different standards of review to the distinct issues raised by City on appeal. Insofar as City asserts the trial court erred by either precluding City's experts from valuing the taken property based on the abandoned Project hypothetical construct or permitting Owners' experts to value the taken property under the no Project construct, we apply the abuse of discretion standard. (*RPP, supra,* 105 Cal.App.4th at p. 1027.) In *City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379 [76 Cal.Rptr.2d 9], this court ruled a trial court has discretion to rule on the admissibility of valuation methods employed by experts in condemnation matters, explaining: " ' " 'In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value.' " ' (*County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1282 [22 Cal.Rptr.2d 117].) Where, as here, 'an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded.' (*Ibid.*) Since Brinig's opinion testimony on the existence and loss of goodwill lacked the necessary foundation, the superior court acted within its discretion in excluding his testimony. (*Ibid.*) As one appellate court has observed, 'There is a limit to imaginative claims . . . . To say that only the witness' valuation opinion has probative value, that his "reasons" have none, ignores reality. His reasons may influence the verdict more than his figures. To say that all objections to his reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts.' " (*City of San Diego v. Sobke,* at p. 396; accord, *City*

*of Stockton v. Albert Brocchini Farms, Inc* (2001) 92 Cal.App.4th 193, 198 [111 Cal.Rptr.2d 662] ["It does not deny due process to cut off a litigant's right to present evidence where the party fails to comply with established evidentiary standards for appraisal methods. Thus, when a valuation expert employs an unsanctioned methodology, the opinion may be excluded in part or in whole in the discretion of the trial court." (Fns. omitted.)].)

**(8)** Owners concede, however, that we must apply a different standard of review insofar as City challenges the jury instruction because the propriety of an instruction given to a jury is a matter of law, which we review de novo.

IV

ANALYSIS

A. *The Ruling on the Hypothetical Constructs*

The issue under section 1263.330 was *how* the appraisers and the jury were to disregard project-caused increases or decreases in the value of the taken property. City argues its abandoned Project construct was a valid hypothetical construct for factoring out the influence of the Project on the core question of whether there was a reasonable probability Owners' land would have been upzoned without the Project. We conclude the trial court did not abuse its discretion by excluding the City's abandoned Project construct because that construct did *not* disregard the impact of the Project on the value of the taken property. To the contrary, this construct posited that the Project's *existence*—e.g., its presence up to November 16, 2001, and the consequences caused by its abandonment (the five-to-seven year moratorium)—negatively impacted the probable upzoning of Owners' land because the Project's existence preempted the development of the alternative transportation plans essential to making it reasonably probable the taken property would have been upzoned by (or shortly after) the November 16, 2001 valuation date.

The trial court's exclusion of the abandoned Project construct preferred by City is consistent with section 1263.330, as construed by our decision in *RPP*. In *RPP*, the central issue was whether City could rely on its zoning restrictions for purposes of valuing condemned property located in subarea IV. The zoning restrictions prohibited upzoning of land potentially affected by SR-56 until the final alignment for SR-56 was approved and, under City's theory, the property did not enjoy a reasonable probability of a zoning change in the near future because its land use regulations prohibited rezonings until the final alignment of SR-56 was approved. Accordingly, the property had to be valued based upon the A-1-10 agricultural zoning in place on the date of

value. In contrast, the landowner's valuation expert testified the property did enjoy a reasonable probability of an upzoning to the higher densities permitted under the subarea IV Plan, and he disregarded City's zoning restriction because it was predicated upon and expressly tied to SR-56. The landowner's planning expert testified that even in the absence of SR-56, the property enjoyed a reasonable probability of a zoning change because development in subarea IV would have proceeded in generally the same manner allowed under the Framework Plan and subarea Plan.

In *RPP*, City moved in limine to preclude the landowner's experts from testifying because these experts improperly excluded from their consideration the zoning restrictions that prohibited development until SR-56 was finalized. The landowner in turn moved to exclude City's experts from rendering an opinion on the reasonable possibility of a zoning change because their opinions were based on the zoning restrictions predicated on the completion of SR-56. The trial court ruled City's zoning restrictions banning upzoning and development of properties targeted for acquisition for SR-56 could not be considered by the jury for the purpose of assessing whether it was reasonably probable the land would be upzoned without SR-56, and therefore precluded City's experts from basing their valuation testimony on such project-predicated restrictions. The court also instructed the jury on the effects of zoning in determining the value of the condemned property, instructing the jury that it was not to consider any effects on value caused by SR-56 or its final alignment, but instead must effectively value the land by "pretend[ing] that State Route 56 does not exist." (*RPP, supra,* 105 Cal.App.4th at pp. 1019–1027, italics omitted.)

In *RPP*, we concluded the trial court did not abuse its discretion when it barred City's experts from relying on the value-depressing effect of project-predicated de jure restrictions when assessing whether there was a reasonable probability RPP's property would have been upzoned in the absence of SR-56. (*RPP, supra,* 105 Cal.App.4th at pp. 1027–1040.) We reasoned that because "established law [is] that a condemned property is to be valued as if the project for which the land is taken did not exist" (*id.* at p. 1033), developmental constraints "predicated on [the] very project" for which the land was condemned were irrelevant to the valuation of the taken property. (*Id.* at p. 1040.) Although in the instant case City does not rely (as it did in *RPP*) on the value-depressing effect of project-predicated de jure restrictions, the abandoned Project construct does rely on the value-depressing effect of project-predicated de facto restrictions on upzoning, because it posits the Project preempted the formulation of alternative trans-portation plans through November 16, 2001, and then imposed a development hiatus because of the vacuum created when the Project was abandoned. We conclude this approach is inconsistent with section 1263.330, as construed by

*RPP,* and therefore the trial court correctly barred City's experts from relying on that construct when valuing the taken property.

On appeal, City appears to argue the trial court also erred by permitting Owners' experts to rely on the no Project construct. City argues this construct substituted an imagined planning process for the planning process that actually occurred to permit opinion testimony that the imagined planning process would have solved transportation issues to permit upzoning to have occurred by or shortly after the valuation date, an approach violating the proscription against valuation testimony that is speculative or conjectural. (*Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 86 [185 Cal.Rptr. 159].) However, City apparently did not object below to the expert testimony based on this construct, and therefore the claim is waived. (*Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 584 [264 Cal.Rptr. 883].) Even had the claim been preserved, we conclude the testimony was not purely conjectural. Owners' planning expert was intimately involved in the planning efforts that produced both the Framework Plan and the subarea IV plan; he was well versed in the pressures that impelled City to begin opening the NCFUA to more intensive development and testified those pressures were independent of the planning for the Project; and he testified many important planning policies could only have been achieved by upzoning in the NCFUA. He also noted that, although he was not a traffic engineer, the Project was primarily intended to handle regional traffic needs, rather than locally generated traffic, and testified the surface street network in the NCFUA could have been supplemented to handle the locally generated traffic had the Project not been constructed. Owners' expert appraiser also cited several examples of areas in San Diego County developed at residential densities without a freeway serving the development. The experts had a solid factual foundation for projecting that an alternative transportation plan would have developed had the Project never been contemplated.

### B. *The* Woolstenhulme *Rulings*

City claims the court made numerous errors in connection with its rulings on the *Woolstenhulme* issues. We evaluate City's claims seriatum.

### *The CEQA Claim*

City argues the court should have barred Owners from valuing the taken property under the *Woolstenhulme* exception because CEQA's requirements, not considered by the *Woolstenhulme* court, have effectively vitiated the *Woolstenhulme* exception. City argues *Woolstenhulme's* exception is rooted in the concept that, when property is adjacent to a pending project and appreciates in value because it is outside the project's probable boundaries, a

subsequent change in or expansion of the project that requires acquisition of the previously *excluded* property requires the condemnor to pay any appreciation in the value of the property that accrued before it became reasonably probable the property would be *included* in the project. However, City argues that under CEQA there can be *no project at all* until the environmental review process (including selection of the specific project alternative) is final, and therefore there is never any previously excluded property to which the *Woolstenhulme* exception can apply. Accordingly, City urges the time is ripe for this court to declare the *Woolstenhulme* exception to be a historical relic.

 Even were this court empowered to jettison *Woolstenhulme,* which it is not (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), the policies and rationale underlying the *Woolstenhulme* exception are not inconsistent with the CEQA process. *Woolstenhulme* was concerned with the constitutional requirement of just compensation where property values rise because the marketplace, having learned of a proposed improvement, places a premium on a specific property. When that premium attaches because the property is *"known to be within the project* [and values rise because] the land is valued *as part of* the proposed improvement rather than as a separate tract of land," or when "the value of *property expected to be condemned . . .* rise[s] because of the anticipation that the condemner will be required to pay an inflated price for the land at the time of condemnation" (*Woolstenhulme, supra,* 4 Cal.3d at p. 490), the condemnee is not entitled to be compensated for that premium. However, when the premium attaches because the property is *"expected to be outside of the proposed improvement* [and values] rise because it is anticipated that the land will reap the benefits resulting from *proximity* to the coming project," a decision to include the property in the project after that premium has attached requires the condemnor to pay for the enhanced value of the property. (*Ibid.*)

We recognize the CEQA process introduces some *degree* of uncertainty as to the precise boundaries of and requirements for a project, including the possibility environmental concerns may require previously probable configurations to be altered, or different or additional property be taken. However, we do not believe the marketplace entirely ignores the *probable* configuration of a project when evaluating whether to place a premium on specific property because it is reasonably probable the property will be outside of, and hence be benefited by, the project. The facts of this case suggest the marketplace had every reason to place a premium on the value of the taken property notwithstanding the uncertainty inherent in CEQA. First, the marketplace was aware for nearly 30 years that the Central Alignment of SR-56 was the *only* configuration for the Project. Moreover, even after City's December 1996 DEIR first suggested there was a *possibility* the taken property might not benefit by being adjacent to the Project, the marketplace was also cognizant that City continued (for another two years) to support the Central Alignment

because of its consistency with the Framework Plan, its superior design from a community planning perspective, and because it provided a more direct route. At least until late 1997 or early 1998, the marketplace could well have placed a premium on the value of the taken property because it was expected not to be included in the Project.

As we understand the *Woolstenhulme* exception, the appreciation in value that attaches before it becomes *probable* the property will be taken for a project is a proper measure of the just compensation owed to the owner. Although a project may not be set in stone before all regulatory requirements (including a final EIR under CEQA) have been satisfied, the owner is nevertheless entitled to be compensated for the fair market value of the property as of the time it became probable it would be acquired for the project. Under this construction, CEQA does not vitiate the *Woolstenhulme* exception.

*The Interpretation Claim*

City next argues, even if the *Woolstenhulme* exception survives CEQA, the trial court erred by interpreting *Woolstenhulme* to permit recovery for any appreciation in market value until it became reasonably probable the taken property would be within the Project (the probable inclusion date). City contends, although the probable inclusion date may be the *latest* date for cutting off project-caused appreciation, *Woolstenhulme* does not permit *any* recovery of project-caused appreciation unless the owner shows, as a threshold matter, there was a reasonable expectation the property would be *outside* the project's boundaries. City asserts because there was no finding below of a reasonable expectation the taken property would be outside the boundaries of the Project, Owners were not entitled to value the taken property under the *Woolstenhulme* exception. Even assuming this issue was preserved,[14] we

[14] On appeal, City cites only to its motion in limine, which sought to bar Owners' appraiser from utilizing *Woolstenhulme* as a basis for valuing the taken property, to support its claim that this theory was raised at trial. Although City's motion in limine does refer to this theory, the thrust of the in limine motion was that *Woolstenhulme* applies only to projects subsequently expanded to include property reasonably expected to be outside the scope of the original project, and here (1) there was no Project at all until City adopted the FEIR and (2) there was never an expansion of the Project. City's current approach is that Owners must make a threshold showing of a reasonable expectation the property would be outside the Project's boundaries before Project-caused appreciation (at least up to the probable inclusion date) may be recovered. This approach does not appear to have been raised in any other context, such as a request for a section 598 hearing to determine whether there was a reasonable expectation the property would be *outside* the Project's boundaries, or by a proposed jury instruction. We nevertheless reach the issue on its merits.

conclude the trial court correctly utilized the stipulated probable inclusion date to implement the *Woolstenhulme* exception for the Project-caused appreciation to the taken property.

The *Woolstenhulme* court addressed two issues. The first issue was whether the just compensation clause ever requires a condemnor to pay an increased price based on the value added by the improvement for which the property is taken. The second issue was, if there is such a requirement, how would a court segregate those cases in which project enhancement was compensable from those not compensable. On the first question, the court concluded property *known* to be targeted for the project may not be valued at its project-enhanced value, but "increases in value attributable to a project but reflecting a reasonable expectation that property will not be taken for the improvement should properly be considered in determining 'just compensation.' " (*Woolstenhulme, supra,* 4 Cal.3d at pp. 490–495.)

On the second question, the court recognized "that, in practice, the segregation of those cases in which 'enhancement' should be compensable from those in which it should not will often entail a difficult task." (*Woolstenhulme, supra,* 4 Cal.3d at p. 495.) To implement that segregation, the court began by noting: "In some instances the public may know from the time of the first announcement of the improvement that certain land will be included in the project. In such cases, since the public knows that the land will not receive the benefits of proximity to the project, the market value of the property will experience no such enhancement; thus, when such property is condemned, the landowner should not receive any 'project enhanced value.' . . . [¶] [Moreover,] [e]ven when public information does not disclose *definitely* that a given piece of property will be used for the project, however, the landowner may not be properly entitled to 'project enhanced' value. Governmental bureaucratic action is notoriously slow, and in many instances the public in general, and, in particular, interested landowners and potential buyers, will be able to determine accurately, well in advance of the formal acceptance of condemnation plans, that a given tract of property will probably be taken for the improvement. In such a case the market value of the land facing imminent condemnation will not rise because, as in the instance of 'definite inclusion,' potential purchasers and sellers can reasonably foresee that the property will not enjoy the advantages of the coming improvement. As our earlier analysis demonstrates, the inclusion of 'enhancement value' in compensation serves only to preserve the reasonable market value of the property. We see no reason to require the state to pay an incremental value if an informed

individual could not reasonably expect that the property would be outside of the project. As the United States Supreme Court has stated in *United States* v. *Miller* (1943) 317 U.S. 369, 377 [87 L.Ed. 336, 63 S.Ct. 276], enhancement value should not be includable in 'just compensation' whenever the condemned lands 'were probably within the scope of the project from the time the Government was committed to it.' " (*Id.* at pp. 496–497, fns. omitted.)

■ After articulating those circumstances (definite inclusion and reasonably foreseeable inclusion) in which rising property values are not recoverable, the court formulated a test to implement its holding that rising value "attributable to a project but reflecting a reasonable expectation that property will not be taken" (*Woolstenhulme, supra,* 4 Cal.3d at p. 495) may properly be considered in valuing the property. The court stated: "If, on the other hand, when plans for the proposed project first became public and when the consequent enhancement of land values began, the probability was that the land in question would not be taken for the public improvement, the landowner would be entitled to compensation for some 'project enhancement.' During that period when it was not likely that his land would be condemned, the fair market value of the property may have appreciated because of anticipation that the land would partake in the advantages of the proposed project. The owner would be entitled to such increase in value. On the other hand, once it becomes reasonably foreseeable that the land is likely to be condemned for the improvement, 'project enhancement,' for all practical purposes, ceases. Thus, in computing 'just compensation' in such a case, a jury should only consider the increase in value attributable to the project up until the time when it became probable that the land would be needed for the improvement. [Citations.]" (*Woolstenhulme, supra,* 4 Cal.3d at pp. 497–498, fn. omitted.)

■ Although *Woolstenhulme* recognized the courts employed a variety of linguistic tests to articulate when project-enhanced value should be included or excluded from the valuation process, it noted that "[d]espite this lack of uniformity or precision in terminology . . . , most of the cases appear to exclude project enhancement whenever the court concludes that an informed owner could reasonably anticipate that the property might well be taken for the project. [Citations.] [¶] In our view the 'probability of inclusion' standard, utilized by the federal courts, expresses this concept adequately and in a readily comprehensible formula; the latter quality is certainly a most important one in this area, where the factual inquiries are invariably quite complex and frequently not susceptible to precise resolution. Accordingly, we believe that this standard is the appropriate one to be utilized in future cases."

(*Woolstenhulme, supra,* 4 Cal.3d at p. 497, fn. 10; see also pp. 497–498, fn. 11 ["we believe that the date of 'probable inclusion' constitutes the most appropriate 'cut-off' date for project enhancement"].)

 Thus, *Woolstenhulme* expressly ruled the probable inclusion date constituted an adequate, comprehensible and appropriate formula to implement its underlying holding distinguishing when enhanced value is to be included in just compensation and when it is to be excluded. Although City urges a two-step test would more properly conform to the *Woolstenhulme* holding, we are not free to substitute a different formula for the test approved in *Woolstenhulme.* (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.) For the foregoing reasons, we conclude the trial court did not err by permitting Owners' appraisers to include project-caused appreciation of the taken property, up to the stipulated June 1998 probable inclusion date, when valuing the taken property. (*Woolstenhulme, supra,* 4 Cal.3d at p. 499, fn. 14.)

### The Instructional Claim

City finally argues the jury instructions concerning valuation were so contradictory and confusing that reversal is required. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670–674 [117 Cal.Rptr. 1, 527 P.2d 353].) The jury here was instructed:

"The subject property may not be valued with reference to . . . what it may be worth to the plaintiff for the purpose for which it is being acquired.

"In determining the fair market value of the property, do not include any change caused by the proposed improvement, that is, the use which the plaintiff is to make of the property. In this regard, once again, the proposed improvement consists only of Unit 2 of the middle segment of Stature Route 56 . . . .

"However, in determining the fair market value of the property you must include any increase in the market value of the property, if any, caused by the proposed improvement that occurred before [June 1998]. In this regard, in determining the highest and best use of the property, you must consider whether the improvements proposed or contemplated for the SR-56 freeway prior to [June 1998], including any alternative alignments previously adopted or considered by the governing agencies, would have increased the probability that the property's zoning would have been changed within the near future as of the November 16, 2001 date of value."

City does not contend the first or second paragraphs were *inaccurate* statements of the valuation principles applicable to determining the just

compensation for the taken property. Moreover, the third paragraph also *accurately* describes the valuation principles applicable to determining the just compensation for the taken property because the *Woolstenhulme* exception has not been superseded and the probable inclusion date remains the appropriate cut-off date for terminating an owner's right to compensation for project-caused rising property values. Thus, although the above quoted instructions involve complex concepts, they are not misleading or inaccurate statements of law. Instead, the cited instructions explain, to the extent the jury found the taken property increased in value *before* it became probable it would be acquired for the Project,[15] this appreciation in value must be included in the jury's fair market value calculus (the third paragraph). However, to the extent the jury found the taken property increased in value after it was targeted for acquisition, the jury was instructed to not include any change in value caused by the proposed Project (the first and second paragraphs).

City's argument appears to be that the instruction was confusing because of the nature of the evidence. Owners' expert valued the taken property using alternative methods, one of which presumed the Project was never contemplated (the no Project construct) and one of which (by utilizing the Central Alignment scenario in reliance on the *Woolstenhulme* exception) presumed the Project had been contemplated. This argument is not premised on instructional error, but instead appears to assert that an expert in a condemnation action cannot premise a valuation opinion on alternative assumptions. However, the no Project construct appraisal method finds legal support in section 1263.330, and the Central Alignment scenario is rooted in the *Woolstenhulme* exception. We are cited no authority that an expert may not simultaneously rely on all legally supported methods to support an opinion on the value of condemned property.

---

[15] City argues, apparently for the first time in its reply brief, that the instruction erroneously extended the *Woolstenhulme* exception by (1) permitting the jury to consider whether the taken property's proximity to the Project increased the probability for upzoning before June 1998 and (2) permitting such probability to be carried forward to the November 2001 valuation date. We have already rejected City's suggestion that a landowner may not invoke *Woolstenhulme* to argue proximity to the project made upzoning reasonably probable. (See fn. 14, *ante*.) Although *Woolstenhulme* did not specifically state this probability would carry forward to the valuation date, the fact eminent domain proceedings in *Woolstenhulme* were commenced nearly three years after the probable inclusion date (*Woolstenhume, supra,* 4 Cal.3d at p. 485) did not preclude the landowner in *Woolstenhulme* from recovering the value that attached to the land *prior* to the probable inclusion date. Because land values can include a component that reflects its highest and best use may change by upzoning (*RPP, supra,* 105 Cal.App.4th at pp. 1028–1029), Owners were entitled to assert the value of the taken property as of November 2001 included a component reflecting probable upzoning that had attached to the taken property prior to the probable inclusion date.

## DISPOSITION

The judgment is affirmed. Owners are entitled to costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied May 17, 2005, and appellant's petition for review by the Supreme Court was denied August 10, 2005. Wergedar, J., did not participate therein.