Filed 8/31/15  City of San Diego v. Caryon Properties CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, | D065915 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00095551-CU-EI-CTL) |
| CARYON PROPERTIES, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Defendant and Appellant.

Jan I. Goldsmith, City Attorney, and Carmen A. Brock, Deputy City Attorney, for Plaintiff and Respondent.

The City of San Diego (the City) filed an eminent domain action against Caryon Properties, LLC (Caryon) to acquire various temporary and permanent easements on Caryon's property for the purpose of expanding Carroll Canyon Road and adding high

occupancy vehicle lanes to Interstate 805 in San Diego. The parties disputed the value of the property and whether a portion of it could be rezoned for light industrial use thereby substantially increasing its value. Prior to trial, the City moved to exclude Caryon's valuation evidence and determine the scope of the City's existing easements on Caryon's property. After an evidentiary hearing, the trial court excluded Caryon's expert valuation testimony based on a probability of rezoning, concluding there was insufficient evidence that would permit a jury to conclude there was a reasonable probability of rezoning the property in the near future. The trial court's ruling was largely based on its interpretation of the City's existing flowage easement on Caryon's property, which the court concluded was effectively a designation of open space. Caryon appeals, arguing the trial court misinterpreted the City's existing easement and erred in finding no probability of rezoning as a matter of law because Caryon presented sufficient evidence for a jury to find a reasonable probability of rezoning.

FACTUAL AND PROCEDURAL BACKGROUND

In 1978 and 1979, the City passed resolutions approving a tentative map for Lusk Industrial Park Units 1, 2, and 3, a Mira Mesa subdivision consisting of approximately 120 lots east of Interstate 805 and north and south of Carroll Canyon Road. As a result, most of the lots were rezoned from undeveloped agricultural land with an A-1-10 zone designation to light industrial. The A-1-10 zoning was "for areas that are presently in agricultural or open space use or which are undeveloped and are either awaiting development or premature for development at urban intensities." The City later changed the name of the A-1-10 zone to the AR-1-1 zone. Lot 75, which is the subject

2

of this appeal, was not rezoned and thus retained its AR-1-1 zoning.  It is a strip of approximately 34 acres of land, which runs east and west along the southern edge of Carroll Canyon Road and is bordered by Interstate 805 on the west.  Most of the lot's frontage along Carroll Canyon Road is a steep slope that descends down from the road into a floodplain.

The environmental impact report (EIR) for the Lusk Industrial Park set forth mitigation requirements for the project.  One of the measures necessary to mitigate potential biological impacts and preserve existing visual resources was to designate that Lot 75 would remain open space.  Lot 75 included riparian woodlands, which are "sensitive habitats in San Diego County.  They are unique in the sense that they comprise only two percent of the natural vegetation in this region."  The tentative map for the project showed most of Lot 75 as designated open space.

The City's Subdivision Board's 1979 resolution approving the Lusk Industrial Park set forth conditions of approval.  Among the conditions was that the mitigating measures set forth in the EIR were incorporated into the resolution and had to be complied with as a condition of the final map.  Further, the resolution required an open space easement as shown on the tentative map.  The resolution also stated, "The subdivider must . . .  provide a flowage easement satisfactory to cover the floodplain area running through the southerly portion of the property, sufficient to accommodate the 100-year frequency flood."

The 1980 final subdivision map for the Lusk Industrial Park showed two different easements on Lot 75: (1) a narrow open space easement running east and west

3

along the southern edge of Carroll Canyon Road, and (2) a larger flowage easement running east and west along the southern edge of the open space easement and extending to the southern edge of the lot.  The flowage easement covered much of the same area as the area designated as open space on the tentative map.

The open space easement provided that the land owner granted to the City an "open space easement . . . reserving, however, to the owner . . . the continued use of the surface of said real property; the right to plant and maintain trees, shrubs and other landscaping elements; and to install and maintain underground pipe systems, sprinklers and appurtenances necessary to maintain landscaping placed thereon."  The flowage easement granted to the City provided "an easement and right of way for the natural flowage of waters over, upon and across [a] portion of Lot [75] . . . , reserving, however, to the owner . . . the continued use of the surface of said real property, and subject to the following conditions:  the erecting of buildings, walls, fences or other structures, or the planting or growing of trees or shrubs, or changing the surface grade, or the installation of privately owned pipelines shall be prohibited. . . .  This easement shall cease and be extinguished upon the effective date of the application to the herein described property of a zone designation which accomplishes essentially the same purpose as this flowage easement."

In 1992, the City updated the Mira Mesa Community Plan (the Community Plan), which is the land use element of the City's General Plan.  The Community Plan is the City's statement of policy for the physical development of Mira Mesa, guides the City's review of development proposals and land use decisions, and designates areas

4

that should remain free from development due to topographic, vegetation and wildlife characteristics. The Community Plan designated Carroll Canyon, including Lot 75, as open space. It further stated, "Carroll Canyon, from I-805 east to Carroll Road, has been placed in non-building area easements through the development review process, preventing development in the most sensitive areas." Thus, as a result of the City's approval of the Lusk Industrial Park, Lot 75 was in a nonbuilding area according to the Community Plan. The Community Plan set forth an action plan to retain AR-1-1 zoning in areas designated for open space preservation, including Lot 75. The Community Plan also noted that Lot 75 was part of a wildlife corridor.

In 1997, the City in coordination with federal and state wildlife agencies adopted the Multiple Species Conservation Plan (the Conservation Plan) to preserve biological resources and identify areas of conservation. The City implemented the Conservation Plan through its Multihabitat Planning Area (Habitat Plan), which identifies biological resource areas in the City. In areas covered by the Habitat Plan, property owners are only permitted to develop 25 percent of their property and must leave the remaining 75 percent as open space. Lot 75 is covered by the Habitat Plan.

In 2006, The Lusk Company (Lusk Company) sold multiple parcels, including Lot 75, to Maymon Limited Partnership (Maymon), in which Christian Tresize had an ownership interest. Lusk Company agreed to sell its property because it had little use for it and understood the property was to be maintained as open space. In 2007, Maymon quitclaimed the property it had purchased from Lusk Company to Caryon.

5

In 2008, Tresize received approval from the City to develop the Nancy Ridge Business Park on Lot 107 of the Lusk Industrial Park for two flat pads for outdoor storage use (the Storage Project). The Storage Project did not include any structures. It was within property designated as open space and light industrial.

Caryon planned to develop a portion of Lot 75. However, the City notified Caryon that it intended to take easements on Lot 75 for a project to expand Carroll Canyon Road, which was later incorporated into a Caltrans project for high occupancy vehicle lanes on Interstate 805. The parties disputed the value of the property and whether a portion of it could be rezoned. Specifically, the City asserted Lot 75 could not be developed as it was dedicated as open space as part of the Lusk Industrial Park. Caryon, on the other hand, asserted that 8.83 acres of the property could be rezoned for light industrial use, which would result in a $4.9 million valuation for the property.

In order to rezone Lot 75, the developer would need to present an application to the City. Additionally, because the Community Plan designates Lot 75 as open space, the developer would need to initiate a General Plan and Community Plan amendment. The process to amend the General Plan and Community Plan requires the City's Planning Commission or the City Council to decide whether a requested land use change is consistent with the major goals and policies of the General Plan. This is the City's highest level of decision making for development projects. If the City Council determines the proposed change does not warrant further analysis, the development project cannot proceed.

6

The City moved for a pretrial evidentiary hearing under Code of Civil Procedure section 1260.040 to determine if there was sufficient evidence from which a jury could find it is reasonably probable that Lot 75 could be rezoned in the near future. The City requested that the court preclude Caryon's valuation experts from expressing an opinion based on Lot 75 being rezoned to light industrial use.

At the evidentiary hearing, Caryon's experts testified there was a high probability that Lot 75 could be rezoned to light industrial use. Joel Morrison, a civil engineer, opined that rezoning was likely because the current AR-1-1 zoning was known as a "holding zone" for future development, the surrounding uses are light industrial, and other property in the same floodplain were rezoned to light industrial. Morrison stated that most of the proposed development on Lot 75 was outside of the floodplain. Further, grading and raising elevations in a floodplain are permitted to raise the property out of the floodplain.

According to Morrison, the flowage easement on Lot 75 was to facilitate the flow of water to the canyon floor and to accommodate a 100-year flood. It would not preclude development of the property. Rather, it is common to modify a flowage easement so long as the developer channels the water to accommodate the same flow. As an example, Morrison stated he worked on the development of a project in the Mission Valley area of San Diego that had a flowage easement on it. The area that included the flowage easement became a parking lot with a box culvert underneath it to channel the flow of water.

7

Morrison acknowledged that the Habitat Plan covered Lot 75 and was an additional overlay of protection on the property to preserve sensitive habitat. In order for any development to occur on Lot 75, the Habitat Plan would require 75 percent to be dedicated open space. Morrison explained that all development projects have constraints on them. However, developers work with City and county staff to resolve the issues.

Matthew Peterson, an attorney practicing in the areas of land use, permitting and entitlements, opined that rezoning Lot 75 was probable because the proposed rezoning and development was only on 25 percent of the property as permitted by the Habitat Plan, there is light industrial development surrounding the property, other similar nearby properties have been rezoned to light industrial, the area's City Council member was favorably inclined to business and development, and it would be possible to develop a mitigation plan to address environmental issues, including the wildlife corridor. However, Peterson acknowledged that the City Council does not typically allow projects built in riparian habitat.

Peterson testified the Community Plan would need to be amended in order to rezone Lot 75. In his opinion, the Community Plan anticipated development of open space through the use of discretionary permits. However, the developer would still be required to comply with the Habitat Plan.

In reviewing the language of the flowage easement on Lot 75, Peterson stated its purpose was to accomplish the natural flow of water. He further stated that the flowage easement could be extinguished or modified through a zone change, amending the map,

8

or amending the easement so long as the change accomplished the same purpose of the flowage easement regarding the natural flow of water. However, when asked about the language prohibiting the construction of buildings and grade changes, Peterson stated those requirements could be modified if the modification accommodated the natural flow of water.

Peterson also testified that properties adjacent to Lot 75, including Lots 105, 106, and 107, were rezoned from AR-1-1 to light industrial despite being subject to flowage and open space easements. However, Peterson did not know if those lots were designated as open space in the Community Plan at the time they were zoned light industrial. Further, he did not think the rezoning of Lots 105 through 107 required a Community Plan amendment.

Lance Doré, a real estate appraiser and consultant, testified that the highest and best use of Lot 75 was light industrial. He based his opinion on his understanding that Lot 75's AR-1-1 zoning was a holding zone. According to Doré, there are hurdles to amending the Community Plan to accomplish rezoning, but it is possible and common. Doré found the current market value of Caryon's property was $4.9 million.

The City's experts testified that it was unlikely Lot 75 would ever be developed or rezoned to light industrial. They based their opinions on various factors, including that Lot 75's AR-1-1 zone designation did not mean that the property was in a "holding zone"; the flowage easement was essentially another type of open space easement; as part of the Lusk Industrial Park, Lot 75 was encumbered with a no-build requirement and the developer had to leave Lot 75 open for the natural flowage of water to the creek

9

bed; the City's open space zones would accomplish the same purpose as the flowage easement on Lot 75 but a light industrial zone would not; and development of Lot 75 with light industrial use was inconsistent with the General Plan, Community Plan, biological guidelines and environmentally sensitive lands regulations. Further, although in general, a project applicant could develop 25 percent of property within the Habitat Plan, any development on Lot 75 had already been exhausted by the Lusk Industrial Park, which set aside Lot 75 as open space.

After hearing the evidence, the trial court found that the probability of rezoning Lot 75 turned on a legal question, namely the proper interpretation of the flowage easement. Specifically, if the flowage easement was effectively a dedication of open space, then the probability of rezoning was unlikely. On that issue, the court found "that the flowage easement on [the final parcel map] was intended to be and is effectively a designation of open space." In reaching its conclusion, the court relied on the language of the easement, which restricted planting or growing of vegetation, changes in surface grade, erection of buildings, walls, fences and other structures, and installation of privately owned pipelines. The court also noted that the developer of the Lusk Industrial Park agreed to set aside certain portions of its property as open space in exchange for the right to develop the remainder for light industrial uses. Given its legal interpretation of the flowage easement, the trial court concluded that "any contention that the City would in the near future rezone the property to a designation inconsistent with open space is, at best, speculation and conjecture." As a result, the court granted

10

the City's motion to exclude expert valuation evidence based on a probability of rezoning.

After the trial court's ruling, Doré prepared a revised property appraisal. This second appraisal valued Caryon's property at $4.24 million based on Doré's conclusion that the property could accommodate a variety of uses, including a plant nursery, open storage or low density residential use. Based on the City's request, the trial court struck Doré's second appraisal, finding it was inconsistent with the trial court's prior ruling interpreting the flowage easement as preserving open space. The trial court granted Caryon two weeks to file a third valuation statement that valued the property as natural open space. Rather than submitting a third valuation statement, Caryon stipulated to entry of judgment in favor of the City in order to expedite an appeal. In the stipulated judgment, the parties agreed that given the trial court's prior orders interpreting the flowage easement as preserving open space and striking Doré's second appraisal, the City's liability to Caryon was $170,000.

## DISCUSSION

### I. *Principles of Eminent Domain*

"Article I, section 19, of the California Constitution requires that the owner whose private property is taken or damaged for a public use be paid just compensation. The federal Constitution similarly provides that private property not be taken for public use without just compensation." (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 743 (*Neumann*).) Our Legislature provides that the measure of compensation for property taken under the government's powers of eminent domain is its "fair market

11

value." (*Id.* at p. 744; Code Civ. Proc., § 1263.310; *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 925 (*Cushman*).) It defines fair market value as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (Code Civ. Proc., § 1263.320, subd. (a); *Cushman*, at p. 925.)

To ascertain the fair market value of a property being condemned in an eminent domain proceeding, there must be a determination of the highest and best use to which the property being condemned can be put, absent any increase or decrease in value attributable to the project itself or project influences. (See *City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1028-1029.) "Moreover, '[a] determination of the property's highest and best use is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner "is entitled to show a reasonable probability of a zoning [or other change] in the near future and thus to establish such use as the highest and best use of the property. [Citations.]" [Citations.] The property owner has the burden of showing a reasonable probability of a change in the restrictions on the property.'" (*Id.* at p. 1028; see also *Neumann*, *supra*, 6 Cal.4th at p. 744.)

12

II. *Standard of Review*

The parties dispute the proper standard of review. Caryon contends this Court should apply a de novo review because the trial court based its ruling on its legal interpretation of the flowage easement and found there was no conflicting evidence on the issue. The City, on the other hand, contends that the trial court's decision to exclude valuation evidence in an eminent domain proceeding is reviewed for abuse of discretion.

We agree with Caryon that the resolution of this case involves a legal question. At the evidentiary hearing, the parties disputed whether the flowage easement was tantamount to an open space designation and Caryon acknowledged that such an interpretation would substantially reduce the probability of rezoning. Thus, the trial court found the probability of rezoning turned on the proper interpretation of the flowage easement on Lot 75. On that legal question, the court concluded that the flowage easement amounted to a dedication of open space. "The interpretation of an easement, which does not depend upon conflicting extrinsic evidence, is a question of law" subject to our independent review. (*Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*. (2003) 107 Cal.App.4th 516, 520; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913.)

III. *Analysis*

A. Interpretation of Flowage Easement

Caryon argues the trial court misinterpreted the flowage easement as being equivalent to a dedication of natural open space. We reject this argument.

13

Caryon first asserts that the trial court's interpretation of the flowage easement was erroneous because the language of the easement makes no reference to maintaining the property as natural open space. Caryon explains the easement's building, planting, grade change, and pipeline restrictions as being consistent with the easement's purpose of providing for the natural flowage of waters. Based on our independent review of the language of the flowage easement and nonconflicting extrinsic evidence, we disagree with Caryon's narrow reading of the flowage easement. The plain language of the flowage easement was on its face more restrictive than the open space easement on Lot 75 as the flowage easement prohibited "the erecting of buildings, walls, fences or other structures, or the planting or growing of trees or shrubs, or changing the surface grade, or the installation of privately owned pipelines." These restrictions were not included in the open space easement. Rather, the open space easement expressly allowed the owner to "plant and maintain trees, shrubs and other landscaping elements; and to install and maintain underground pipe systems, sprinklers and appurtenances necessary to maintain landscaping." While the flowage easement did not specifically state that the property had to be maintained in its natural state, the prohibitions outlined in the easement reflected that purpose.

Moreover, the EIR for the Lusk Industrial Park reinforces that the intent of the flowage easement was to retain Lot 75's natural state. As set forth in the EIR, one of the measures necessary to mitigate potential biological impacts and preserve existing visual resources was to designate that Lot 75 would remain open space as shown on the tentative map. The final map did not match the tentative map in that the open space

easement on the tentative map was divided into separate open space and flowage easements on the final map. However, the City's Subdivision Board's 1979 resolution approving the Lusk Industrial Park set forth as a condition of approval that the mitigating measures set forth in the EIR had to be complied with as a condition of the final map and required an open space easement as shown on the tentative map. In addition, the resolution required "a flowage easement satisfactory to cover the floodplain area running through the southerly portion of the property, sufficient to accommodate the 100-year frequency flood." Taken together, these requirements establish that the flowage easement in this case was intended both to accommodate the natural flowage of water and to mitigate potential biological impacts by retaining Lot 75's natural biological and visual resources.

Caryon next argues the trial court erred in relying on the tentative map and EIR because only the final map was recorded and provided notice to Tresize of the restrictions on the property. Caryon is essentially arguing that the trial court imposed additional restrictions on Lot 75 by relying on extrinsic evidence. "Although extrinsic evidence is not permitted in order to add to, detract from, or vary the terms of an integrated written agreement, extrinsic evidence is admissible in order to explain what those terms are." (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 521.) "Therefore, extrinsic evidence as to the circumstances under which a written instrument was made has been held to be admissible in ascertaining the parties' expressed intentions, subject to the limitation that extrinsic evidence is not admissible in order to give the terms of a written instrument a meaning of which they are not reasonably

15

susceptible."  (*Id*. at p. 522.)  " 'Intent of the parties may be ascertained from the language of the deed and from relevant parol evidence, including that which described the surrounding facts and circumstances existing at the time of the conveyance in question.' " (*Id.* at pp. 522-523.)  "[I]n ascertaining the intention of the grantor [of an easement], as in any other contract, in the absence of an express declaration, the nature of the easement may be determined by evidence *aliunde* the deed."  (*Id*. at p. 523.)

Caryon contends the trial court erred in supplementing the purpose of the flowage easement by adding a requirement that the property be retained in its "natural state" when the flowage easement's only stated purpose was to provide for "the natural flowage of waters."  We do not agree that the trial court added terms to the flowage easement based on extrinsic evidence.  The trial court interpreted the flowage easement on the final map and concluded that it was "effectively a designation of open space." Although the trial court recited the history of the flowage easement, including the EIR's requirements and open space designation in the tentative map, its conclusion was largely based on the significant prohibitions in the flowage easement regarding the erection of buildings, walls, fences and other structures, planting or growing of trees or shrubs, changing the surface grade, and installation of privately owned pipelines.  The trial court did not rely on the historical context of the flowage easement, including the EIR and tentative map, to modify or supplement the terms of the flowage easement as shown on the final map.  Instead, those documents provided background and reinforced the trial court's conclusion based on the language of the easement that the intent of the

16

flowage easement was to maintain the natural condition of Lot 75 to, among other things, protect habitat and biological resources.

Even if the trial court's conclusion was based on the nonconflicting extrinsic evidence, namely the EIR and tentative map, the trial court did not err in considering that evidence. The flowage easement was reasonably susceptible to an interpretation that it required the owner to maintain the property in its natural state. While the easement states it is for the "natural flowage of waters," it goes on to set forth restrictions on building, planting, grading and pipeline installation. Those significant restrictions suggest a purpose to maintain the property's natural state. Thus, the trial court could properly consider the circumstances surrounding the conveyance to determine the parties' intent.

Lastly, Caryon contends that under the trial court's interpretation, all flowage easements utilizing the City's standard easement language, as was used here, would be transformed into a requirement that property owners forever maintain their properties in their natural state. Although we agree with the trial court's interpretation of the flowage easement in this case, we do not express any views regarding the City's standard language for flowage easements and whether that language necessarily amounts to a designation of open space. Rather, interpretation of an easement may involve consideration of such matters as the circumstances under which the deed was made, the type of rights conveyed, the relationship between the easement and the other real property owned by the recipient of the easement, the conduct and intent of the parties, and the actual and contemplated uses by the parties at the time of the conveyance.

17

(*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 569; *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 246; *Maywood Mut. Water Co. No. 2 v. City of Maywood* (1972) 23 Cal.App.3d 266, 270-271.) In light of these principles and the rules governing interpretation of easements, we decline to accept Caryon's over generalized proposition that the trial court's finding, or ours, converts flowage easements utilizing the City's standard language into natural space requirements.

B. Sufficiency of the Evidence on Probability of Rezoning

Caryon argues it presented sufficient evidence for a jury to find a reasonable probability of rezoning. We disagree.

"'"[T]he determination as to whether or not there is a reasonable probability of a [use] change is ordinarily a question of fact for the jury."'" (*Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 967 (*Metropolitan Water*).) "Before such evidence may be presented to the jury, however, the trial court must first determine whether there is sufficient evidence that would permit a jury to conclude there is a reasonable probability of rezoning in the near future. Evidence of a reasonable probability of a zoning change in the near future '"must at least be in accordance with the usual minimum evidentiary requirements, and that which is purely speculative, wholly guess work and conjectural, is inadmissible."' [Citation.] The evidence, if credited, must also be sufficient to establish that rezoning is reasonably probable. [Citation.] If the trial court determines that no fact finder could find a reasonable probability of rezoning on the record presented, it may exclude all evidence

18

and opinions of value based on a use other than that authorized by the existing zoning." (*Id.* at p. 968; see also Code Civ. Proc. § 1260.040.)

Here, Caryon acknowledged that if the flowage easement required the property to be maintained as open space, it would substantially reduce the probability of rezoning. Caryon also did not dispute that in order to rezone Lot 75, it would need to request an amendment to the Community Plan and the City's General Plan because the Community Plan showed the property as open space. However, Caryon's experts testified that there was a high probability of rezoning to light industrial use. The City's experts disagreed.

While resolving conflicts in expert testimony is for the jury to decide (*City of Riverside v. Kraft* (1962) 203 Cal.App.2d 300, 304), the trial court acts as a gatekeeper by excluding evidence that is "'"purely speculative, wholly guess work and conjectural."'" (*Metropolitan Water*, *supra,* 41 Cal.4th at p. 968.) Caryon's experts based their conclusion in part on their belief that Lot 75's AR-1-1 zoning was a "holding zone" for future development. This contradicted the trial court's ultimate legal finding and our conclusion that the flowage easement required that Lot 75 be maintained in its natural state.

Caryon's experts also simplified the rezoning process by stating that all projects have constraints that can be accommodated by working with City staff. However, those opinions did not account for an interpretation of the flowage easement as requiring the property be retained in its natural condition. Rather, Peterson opined that the designation of Lot 75 as open space in the Community Plan was simply an error that required "clean up."

19

Peterson further stated rezoning was probable in this case because the City Council member for the area was favorably inclined to business and development and the other Council members would simply go along with her. Peterson had not talked to the Council member for Lot 75 regarding the rezoning at issue in this case. Based on our review, Peterson's opinion as to what that Council member and the entirety of the City Council would do was nothing more than guess work.

Further, Caryon's experts did not point to any properties with similar constraints as Lot 75 that had been rezoned. In particular, Lot 75 faces numerous hurdles to rezoning, including amending the General Plan and Community Plan, accommodating the natural flowage of water in a manner consistent with the flowage easement's restrictions, working with the Habitat Plan's requirements, acknowledging the Lusk Industrial Park's prior mitigation agreements, and rezoning to a zone that accomplished the same purpose as the existing flowage easement. For example, the projects Morrison identified were in a different position than Lot 75 because they were raw land that had not been previously subdivided. Similarly, although Peterson testified that Lots 105, 106 and 107, which included the Nancy Ridge Business Park, were rezoned from AR-1-1 to light industrial and were subject to a flowage easement, he was unaware if those lots were designated as open space on the Community Plan at the time they were rezoned. Moreover, the Nancy Ridge Business Park development resulted in a net gain of sensitive habitat in the Habitat Plan and the area for the proposed storage use was entirely within the portion of the site designated as light industrial and did not encroach into the open space area.

20

Based on the trial court's interpretation and our consistent interpretation of the flowage easement as requiring that the owner maintain its natural condition, we conclude Caryon failed to present evidence that there was a reasonable probability of rezoning in the near future. Caryon's experts based their opinions on their understanding that Lot 75 was in a "holding zone" rather than subject to a natural space requirement and failed to give any basis for how Lot 75 could be rezoned in light of its restrictions. Accordingly, as the trial court stated, "[A]ny contention that the City would in the near future rezone the property to a designation inconsistent with open space is, at best, speculation and conjecture."

Lastly, Caryon argues for the first time in its reply brief that even assuming that the property could not be rezoned, the trial court's misinterpretation of the flowage easement and order striking Doré's second appraisal precluded Caryon from valuing the property based on its highest and best use consistent with the current AR-1-1 zoning, which included such uses as a plant nursery. It is well settled that arguments raised for the first time in an appellant's reply brief are forfeited unless good reason has been shown for failure to raise them earlier. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc*. (2000) 78 Cal.App.4th 847, 894, fn. 10.) Caryon does not explain why it failed to address this argument in its opening brief and we conclude it forfeited this issue by raising it for the first time in its reply brief.

DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


McINTYRE, J.

WE CONCUR:

HALLER, Acting P. J.

McDONALD, J.

22